**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENN MONT SECURITIES** | : | |
| And its partners | : | |
| **83 East Lancaster Avenue** | : | |
| **Paoli, PA 19301** | : | |
| | : | |
| On its own behalf and on behalf | : | |
| of all other shareholders of PHLX | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. |
| | : | |
| **MEYER S. FRUCHER** | : | **JURY TRIAL DEMANDED** |
| **324 W. 101st Street** | : | |
| **New York, New York** | : | |
| | : | |
| **WILLIAM N. BRIGGS** | : | |
| **9 Eyres Place** | : | |
| **Somerdale, New Jersey   08083** | : | |
| | : | |
| **NORMAN STEISEL** | : | |
| **280 Garfield Place** | : | |
| **Brooklyn, NY** | : | |
| | : | |
| **KEVIN MICHAEL FOLEY** | : | |
| **55 Liberty Street** | : | |
| **New York, New York   10005** | : | |
| | : | |
| **CHRISTOPHER NAGY** | : | |
| **22030 Stanford Circle** | : | |
| **Elkhorn, Nebraska   68022** | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Penn Mont Securities and its partners on its own behalf and on behalf of

all other shareholders of the Philadelphia Stock Exchange ("PHLX") hereby files this action

against defendants for acts, committed together and separately, meant to enrich themselves by

and through PHLX at the expense of plaintiff and others similarly situated and avers as follows:

## PARTIES

1.     PennMont Securities, ("PennMont") is a Pennsylvania partnership with its principal office and place of business located at 83 East Lancaster Avenue, Paoli, PA 19301. PennMont, as a firm, has been a Member of PHLX since December 19, 1981.

2.     At all times relevant hereto before demutualization, the process by which PHLX was converted to a stockholder-owned for-profit corporation, as more particularly described herein, there were 505 "seats" on the PHLX and at various times relevant herein plaintiff owned as many as 5 seats on the PHLX.

3.     In 1998, the value of all the memberships (seats) on PHLX was in excess of $150,000,000.

4.     Since 1998, due to the actions of the present management of PHLX, including but not limited to defendants, the value of PHLX seats (expressed both as seats, and as the value of shares obtained in exchange for such seats) has declined.

5.     Post-demutualization, 50,500 shares of PHLX were issued in 2004 and in 2005 at least an additional 5,050 shares were issued.

6.     At relevant times, the aggregate fair market value of the interest held by plaintiff in PHLX by way of seat or share ownership was well in excess of $200,000.

7.     The Philadelphia Stock Exchange, Inc., founded in 1790, is the oldest stock exchange in the United States.  PHLX's principal office and place of business is located at 1900 Market Street, Philadelphia, Pennsylvania 19103.

8.     From 1972 until demutualization in January 2004, PHLX was a not for profit, non-stock, membership corporation incorporated under the laws of the State of Delaware.

9.      PHLX was a not for profit corporation which existed so its members and member firms could transact business by buying, selling, pledging, exchanging, trading, and dealing in articles of commerce, including stock, bonds, options, currency, and derivatives.

10.     As a not for profit corporation PHLX was prohibited by its Certificate of Incorporation from declaring dividends or issuing stock.

11.     Before demutualization, all of the costs involved in operating PHLX as a stock exchange were paid by fees imposed upon members or seat owners or from certain activities of the PHLX that generated income for the PHLX such as, but not limited to, "tape revenues", i.e., fees that were paid by a reporting service for the information on the transactions that occurred on the PHLX.  Any shortfall PHLX incurred for operations was assessed against either all members or seat owners or both.

12.     The contractual relationship PHLX has with its members and owners is defined by its Certificate of Incorporation and its By-Laws, including its Code of Conduct.

13.     That contractual relationship and general principles of corporate governance require that compensation and governance committees be populated by directors who have no personal interest or family interest in the issues considered by the committees.

14.     Defendant Meyer S. Frucher is a resident of New York and is an officer of PHLX, with a place of business at 1900 Market Street, Philadelphia, Pennsylvania 19103.  Mr. Frucher has been a director of PHLX since 1997 and has served as Chairman and Chief Executive Officer of PHLX since June 1998.  Upon information and belief Mr. Frucher now owns in excess of 2,500 shares of PHLX.  This defendant is being sued for his individual acts while a member of the Board of Governors of PHLX and an officer of PHLX.

15.     Defendant William N. Briggs is a resident of New Jersey and is an employee and an officer of PHLX, at 1900 Market Street, Philadelphia, Pennsylvania 19103.  Upon information and belief Mr. Briggs now owns an undetermined number of shares of PHLX.  Briggs also had roles at Stock Clearing Corporation of Philadelphia ("SCCP") and The Philadelphia Depository Trust Company ("Philadep"), (wholly owned subsidiaries of PHLX).  This defendant is being sued for his individual acts while an officer of PHLX.

16.     Defendant Norman Steisel is a resident of New York and has been a contracted consultant to and recently has been named an employee and Senior Executive of PHLX.  Mr. Steisel provided consulting services to PHLX.  Upon information and belief Mr. Steisel now owns an undetermined number of shares of PHLX.  This defendant is being sued for his individual acts while employed or contracted as a consultant by PHLX.

17.     Defendant Kevin Michael Foley is a resident of New York and was the chair of the Demutualization Advisory Group of the Board of Governors of PHLX.  This defendant is being sued for his individual acts while a member of the Board of Governors of PHLX and for his individual actions as Chair of the Demutualization Advisory Group.

18.     Defendant Christopher Nagy is a resident of Nebraska and was Off Floor Vice Chairman, member of the Board of Governors and member of the Demutualization Advisory Group.  This defendant is being sued for his individual acts while a  member of the Board of Governors of PHLX and for his individual actions as a member of the Demutualization Advisory Group.

19.     The above named defendants who are natural persons may be referred to collectively in what follows herein as the "Individual Defendants".

20.     The wrongful conduct and harm alleged herein are ongoing.

4

## JURISDICTION

21.     Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1332.  Although a federal

question is alleged, Civil RICO, even without a federal question, diversity jurisdiction would be

proper because the action is between citizens of different states and the amount in controversy

exceeds $75,000, exclusive of interest and costs.  Supplemental jurisdiction of the state law

claims is based upon 28 U.S.C. § 1367.

## VENUE

22.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§

1391(a)(2) and (b)(2) because a substantial part of the acts and/or omissions giving rise to the

claims set forth herein occurred in this judicial district..

23.     At all times relevant hereto, PHLX, as an Exchange, has been, and still is, a "self

regulatory organization" ("SRO") under the Exchange Act; see, in particular, 15 U.S.C. § 78s.

## FACTUAL BACKGROUND

24.     At all times relevant hereto, the PHLX has been, and still is, a registered securities

exchange ("Exchange") under the Securities Exchange Act of 1934; 15 U.S.C. Chapter 2B

(hereinafter the "Exchange Act").

25.     As an Exchange and an SRO, PHLX has had and has a number of duties imposed

upon it by the Exchange Act and the rules and regulations promulgated thereunder, as such have

been amended from time to time, that, among other things, govern how members are to conduct

their business of the PHLX and what safeguards and procedures are to be used to ensure

compliance with applicable rules, regulations, directives and other requirements issued by

agencies with jurisdiction over PHLX and its members.  As an SRO, PHLX has had and has

responsibilities to enforce members' compliance with such rules, regulations, directives and other requirements issued by agencies with jurisdiction over PHLX and its members.

26.     Before demutualization, one could only engage in business on the PHLX if one owned or leased one of the limited number of seats on the PHLX or was dually affiliated with another PHLX member.  Just prior to demutualization there were 505 seats.

27.     Before demutualization, the PHLX was entirely owned by those natural persons or legal entities that owned a seat on the PHLX; whereas the members of the PHLX consisted of those natural persons or legal entities that were using a seat to engage in business or could be an owner without being a member of PHLX. Therefore, one could be a member of PHLX without owning a seat on the PHLX, and one could be a seat owner without being a member.

28.     Before demutualization, the owner of a seat on the PHLX could either use the seat to engage in business on PHLX or could lease the seat to a qualified lessee to engage in business on the PHLX.  A seat on the PHLX had value to the owner even if the owner did not choose to engage in business on the PHLX because income could be derived from leasing the seat to another who wished to engage in business on the PHLX.

29.     In 2003 PHLX officers, specifically Mr. Frucher, announced a plan for demutualization.

30.     In October 2003, PHLX officers, including Mr. Frucher, caused to be distributed to seat owners and members an Information Memorandum by telecopy, by United States mail and by hand delivery describing demutualization and stating that the continued existence of PHLX was in question due in part to ongoing losses.

31.     On January 20, 2004, PHLX became a for-profit Delaware corporation, i.e. able to pay dividends, that is owned by its shareholders, through a process known as "demutualization"

whereby each owner of a seat was issued 100 shares of stock in exchange for the seat that was thereby extinguished.

32.     After demutualization, a member of PHLX no longer needed to either own or rent a seat to be able to engage in trading on PHLX.  Instead a person seeking to do business at PHLX was required to obtain a permit from PHLX and pay a monthly fee for that permit or be dually affiliated with another permit holder.

33.     After demutualization, the only income a former seat owner, now a shareholder, could receive from PHLX or its operations would be a dividend paid on the shares of stock given to the shareholder in exchange for the seat.

34.     After demutualization, Mr. Frucher, his friends and allies, including the other defendants, took the opportunity to enrich themselves by gaining shares of PHLX, something they could not do prior to demutualization.

35.     According to the 2004 Annual Report of PHLX, since the year 2001 PHLX has had a net loss every year.  These losses, as reported, do not include unfunded liabilities such as pension benefits, deferred compensation and loans to officers that are to be "forgiven," all of which combine to increase the loss to PHLX and diminish its value.

36.     As a result of acts set forth herein, plaintiff has lost seat rent in excess of $400,000.  It is believed and therefore averred that all shareholders had similar losses.

37.     As a result of acts set forth herein, plaintiff individually has lost seat value (expressed both in terms of the lost value of such seats prior to demutualization, and the value of such seats in comparison with the value of shares received by plaintiff as a result of demutualization) of at least $1,000,000.  It is believed and therefore averred that all shareholders had similar losses during the relevant time period.

**Continuing Adverse Impact on PHLX and its Members of SEC Sanctions Imposed on
PHLX for Misconduct Relating to Philadep and SCCP**

38.     PennMont has engaged primarily in the trading of equities on PHLX.

39.     PennMont, by virtue of PHLX seats, memberships and permits held by it and its
partners, at various times, is and has been entitled to trade equity securities, options securities
and other articles of commerce on the PHLX.

40.     Starting from at least 1998, near the beginning of Mr. Frucher's tenure, and
continuing to the present, PHLX has suffered from mismanagement, demonstrated in part by the
findings from investigations of the United States Securities and Exchange Commission ("SEC")
and the United States Department of Justice ("DOJ"). Those investigations have resulted in the
issuance of at least four SEC and DOJ orders involving Philadep, SCCP, anticompetitive
practices in the options market, and others relating to misconduct relating to Philadep and SCCP,
some of which is more fully set forth below.

41.     Mr. Frucher became an officer and director of PHLX prior to the settlement of the
actions referred to in the paragraph immediately above.

42.     Subsequent to the settlement with the DOJ relating to anticompetitive practices in
the options market, the multiple listing of options finally became a reality and competition
commenced among the options exchanges by the dually listing of options.

43.     Mr. Frucher seized this opportunity to co-opt the aspiring specialist applicants for
the most lucrative books, all the time tightly controlling the allocation process until the specialist
committed to Mr. Frucher's plan to rupture the registered option traders.  Mr. Frucher paid the
specialists with money that he assessed against the registered option traders.  Mr. Frucher then

handed their money over directly to the competition, the specialists, so he could further control the enterprise.

44.     By taking these actions, Mr. Frucher likely violated the Securities Act of 1975 which by intent of Congress provided for "negotiated rates, commissions and fees" between brokers and dealers.  Mr. Frucher interposed PHLX between competing dealers, actually setting fixed fees (engineered by Mr. Briggs) and then collecting and allocating those preset fees at Mr. Frucher's discretion.

45.     Mr. Frucher's purported rationale for the actions taken with respect to competition set forth above was that it was necessary for the preservation of the system, when, it is believed and therefore averred, in actuality the only system Mr. Frucher was really interested in was his demutualization plan which would give him the opportunity to obtain equity, which he realized was worth in total in the ten figure range.

46.     Mr. Frucher used the authority granted him as the head of an SRO to manipulate the regulatory mechanism to benefit himself and his personal allies, including the other defendants, ignoring PHLX members and owners in place as incidental.

47.     In or about 1997 at the direction of then-Acting Chairman John Wallace, substantial "golden parachute" payments were made to departing officers and employees, when those persons should have been disciplined, discharged and/or referred for enforcement actions by appropriate legal authorities.  Payments for such arrangements were made from funds that belonged to the owners of PHLX.

48.     Since that time defendant Frucher engaged in similar and other lucrative payments for his allies on PHLX' staff, consultants and Board of Governors, including the other defendants.

49.     In order to find out what the officials at PHLX were doing to the Exchange and its members, plaintiff made written demands on September 22, 1998, and on October 20, 1998 on Mr. Frucher and PHLX for inspection of PHLX documents pursuant to § 220 of the Delaware General Corporation Law, 8 Del. Code. § 220.

50.     PHLX officers, including but not limited to Mr. Frucher, and those who discharge their responsibilities at PHLX under his authority, unlawfully refused to allow inspection of any of the requested materials.

51.     To redress these unlawful refusals to allow inspection, on November 2, 1998, an action was instituted by the plaintiff in the Court of Chancery of the State of Delaware for New Castle County, No. 16764, to enforce the plaintiff's statutory rights of inspection.

52.     Two years later on October 17, 2000, the Delaware Court ordered PHLX to produce the documents requested for inspection.

53.     On May 18, 2001, more than seven months after the Delaware Court ordered it, PHLX through its attorneys hired by the Board of Governors headed and controlled by Frucher finally produced some documents as ordered by the Delaware Court dating through early 2001. Those documents have confirmed mismanagement and dishonesty; the continuing failure to pursue reimbursement of the consequences of that dishonesty; and the award of generous severance packages through at least 2000.  Plaintiff believes and therefore avers, on the basis of other information available to them, that PHLX still has not yet been fully compliant with the Order of the Delaware Court because of the actions of some or all of the defendants and those operating under their direction or control.

54.     Plaintiff has learned that several Members of the Board of Governors of PHLX assumed, maintained or currently hold their offices with conflicts of interest they failed to

disclose or, if a conflict was known, failed to recuse themselves from participation in deliberations or decisions on matters on which there was a conflict.  Those conflicts should have disqualified them from acting as Members of the Board of Governors of PHLX, either in general, or with respect to any sale, merger or restructuring transaction, or with respect to any other activity which could have a material impact on PHLX.

55.     An example of such conflict, by way of illustration and not by way of limitation, is one former member of the Board of Governors, an associate of Mr. Frucher, the Off-Floor Vice Chairman, Christopher Nagy, with an interest in transactions relating to the QQQs described more particularly below participated in discussions and the decision about the NASDAQ 100 Tracking Stock ("QQQ transactions").

56.     QQQ's are the NASDAQ 100 tracking stock.  Mr. Nagy was the Director of Trading of Ameritrade Clearing Inc. and from time to time held other responsibilities with such firm and affiliates thereof.   As a result of that position, he had access and/or order flow to the QQQs and could direct hundreds if not thousands of trades to the floor of PHLX, which he did.

57.     It is believed and therefore averred that in or about 2002-2003, Mr. Frucher and Mr. Wallace arranged for Mr. Nagy and/or Ameritrade to send those trades to PHLX and averred that Heard & Company, a PHLX member firm with a PHLX Board-awarded exclusive right to electronically trade the QQQs, would pay Mr. Nagy and/or Ameritrade for those orders.  Mr. Frucher at the same time made an arrangement to feed some or all of the tape revenue collected by PHLX per trade to Heard & Company so Heard could pay Mr. Nagy and/or Ameritrade for sending the orders to PHLX.

58.     Those trades gave rise to hundreds of violations lodged by the SEC against PHLX.

59.     In or about 2002, it was discovered that for more than a year PHLX had failed to collect transaction fees supposed to be paid to PHLX by Heard & Company in the amount of approximately $500,000.  Because it was supposedly a computer glitch, the PHLX Board of Governors, on Mr. Frucher's recommendation, waived the fee by retroactively changing the rule that required the fees to be paid.  However, the discovery of this debt created a danger of discovery of the Nagy/Ameritrade/Heard arrangement.

60.     It is believed and therefore averred that Mr. Nagy as a member of the Board of Governors and in conflict of interest as a result of his association with Ameritrade and Ameritrade's association with Heard & Company, both advocated for the repeal of the fee imposed on Heard & Company and gave incorrect information to the Board of Governors with respect thereto.

61.     Other, similar plans devised by defendants and others for PHLX soon followed, the goal of all of which, it is believed and therefore averred, was to enrich defendants and their friends at the expense of PHLX and its seatholders.

62.     It is also believed and therefore averred that defendants would not do deals in which they did not significantly benefit personally.

63.     Mr. Frucher and the other defendants continue to act to create additional structures to fund buy-out and retirement packages in their personal interest, but not in the interest either of the public or the members and/or owners of PHLX.

**Extraordinary Payments Made to Certain Officers or Board Members**

64.      Prior to Mr. Frucher becoming the leader of the Exchange, but during his Board tenure, extraordinary payments were made to certain officers and Board Members, thus he was aware of the mechanism by which such payments could be accomplished.

65.      Before demutualization, any shortfall that PHLX incurred for operations was assessed against all members or seat owners or both.

66.      At one time PHLX had wholly owned subsidiaries, a depository, Philadelphia Depository Trust Company ("Philadep"), and a clearing corporation, Stock Clearing Corporation of Philadelphia ("SCCP").

67.      Philadep and SCCP gave great value to PHLX as an operating entity because not only did those two operations generate substantial revenue that, in effect, lowered the costs and charges that members and seat owners might otherwise have had to pay to cover the operations of PHLX.  Those operations also provided a reason for nonmembers to do business with PHLX rather than doing business at other exchanges.

68.      Both Philadep and SCCP were subject not only to federal law, such as, but not limited to, the Exchange Act and rules and regulations promulgated thereunder, but also to state law requirements.

69.      As determined by the SEC, in an administrative proceeding at File No. 3-9360, released to the public as Release No. 38918 of August 11, 1997, the SEC found violations in connection with the operation of both Philadep and SCCP.

70.      Specifically, the SEC finding, at pages 3-4, stated:

>     During the period from February 1996 through June 16, 1996, in
>     order to alleviate the PHLX's short-term cash deficits, funds were
>     transferred to the PHLX from a SCCP operating account

containing SCCP's and Philadep's participants' funds, general corporate funds and other funds.  As SCCP's and Philadep's corporate parent, the PHLX routinely incurred costs on their behalf for which the PHLX would be repaid, generally through wire disbursements from the SCCP operating account.  During the above-referenced time period, however, at least eleven wire disbursements were made from the SCCP operating account to the PHLX for amounts in excess of actual costs incurred by the PHLX on SCCP's and Philadep's behalf.  The total funds transferred through these eleven disbursements ranged from $650,000 in one month to slightly over $2 million in the highest month.  Of these funds, amounts transferred to the PHLX in excess of actual costs incurred ranged, on a monthly basis, from approximately $54,000 to approximately $1.3 million.  These monies were routinely paid back to SCCP when the PHLX's short-term cash flow permitted such payments.

71.    SCCP and Philadep did not safeguard participants' funds to the degree required by applicable laws and regulations.  The SEC averred that although funds were routinely disbursed from the SCCP operating account to the PHLX, SCCP did not monitor whether participants' funds were being used to, among other things, alleviate PHLX's short-term cash deficits.  Consequently, SCCP and Philadep were unable to, for example, determine effectively, at any time during the day, whether participants' funds were used for this purpose.

72.    Upon information and belief, funds referred to in the preceding paragraph were wrongfully used to pay PHLX operating expenses, executive salaries and bonuses; it was wrongful not only because the funds were unlawfully taken from SCCP and Philadep but also because such a payment by a not for profit corporation that did not have available funds was also wrongful.

73.    The foregoing misconduct imperiled the financial integrity and existence of PHLX and its subsidiaries, the financial and business interests of its members and violated various provisions of the securities laws as well as other statutes and the common law.

74.     The SEC directly caused PHLX to obtain the resignation of Timothy J. Guiheen, who had served as President of Philadep and SCCP, in February 1997 because of his involvement and participation in the aforementioned scheme to improperly transfer funds from Philadep and SCCP to PHLX for inappropriate uses.

75.     Nevertheless, Guiheen benefited from a severance agreement from PHLX that included, among other things, a consulting contract with PHLX for 22 months that provided total payments to him in excess of $350,000 as well as payment for benefits for at least two years. The members and owners of PHLX were directly and adversely affected by such payments.

76.     Not only was the wrongdoing alleged by the SEC with respect with SCCP and Philadep in violation of the securities laws, but it also damaged the financial integrity of the PHLX, adversely impacted the financial and business interests of the members and seat owners of PHLX, and led to the loss of many members and customers of PHLX, SCCP and Philadep.

77.     During times relevant, Nicholas A. Giordano ("Giordano") was both president and CEO of the PHLX. Giordano was also chairman of SCCP and Philadep.

78.     Certain cease and desist orders issued by the SEC in connection with the wrongdoing stated herein led to the resignation of Giordano.

79.     Vice Chairman Wallace, knowing of the SEC investigation with respect to SCCP and Philadep, as a member of the Board of Governors and at the time Chairman of PHLX, proceeded to conclude a new employment contract with Giordano on the day Giordano resigned in 1997 that was to provide an increased severance payment and other post-employment benefits to Giordano even if he was discharged for cause or criminal conduct.

80. Giordano was given, among other things, a severance payment in excess of $2,000,000 plus post-employment bonuses, payment for benefits for four years, an automobile, and various insurance policies on which PHLX had been the beneficiary were assigned to him.

81. The aforementioned acts of then-Acting Chairman Wallace were not within the scope of a reasonable business judgment and outside the scope of proper conduct.

82. As members and owners of PHLX, which was then a not for profit corporation, plaintiff was compelled to directly contribute by mail or wire for the aforementioned wrongful payments. The actions have continuing adverse impact on PHLX and its members.

**Failure to Seek Insurance Coverage**

83. At the relevant time PHLX had in effect an insurance policy that provided coverage for the wrongdoing set forth in the preceding paragraphs.

84. The failure to submit a claim to the insurance carrier for the aforementioned wrongdoing as well as with respect to the continuing wrongdoing otherwise described herein, constitutes the wasting of PHLX assets by the defendants and is not within the scope of a reasonable business judgment.

85. Plaintiff, as a member, was, and has been, caused to make payments to PHLX in excess of what otherwise would have been necessary to pay as a direct result of the failure to submit an insurance claim.

86. More than one seatholder informed defendant Frucher and the PHLX Board of Governors of the ability to assert a claim under the relevant insurance policy to seek recovery of money paid and requested they do so. That request was ignored.

87. It is believed and therefore averred that no claim was made under any insurance policy to avoid the investigation that would surely follow such claim.

**Excessive Payments to Senior Management**

88.     Beginning in or about the year 2000 and continuing, PHLX did not have adequate cash or funds to timely meet all of its obligations.

89.     As a not for profit corporation PHLX was obligated to keep the payments made for the services of its officers and payments for its consultants within certain constraints governed by the size of the enterprise and the dollar volume of the business.

90.     PHLX was without adequate funds to make such payments at the relevant times. Any additional or excessive payments made during such times to senior management, other officers and/or consultants would be improper.

91.     At or about that time, the PHLX Compensation Committee became more active. Mr. Frucher controlled the Nominating Committee who recommended to the Board appointments to the Compensation Committee.  Mr. Frucher was an advocate for increasing the stipend paid to members of the PHLX Board of Governors for serving on the Compensation Committee and otherwise improperly influenced the action of such Committee and its members to his benefit, and that of other members of senior management, including the other defendants.

92.     Upon information and belief, funds that were necessary for the operation(s) of PHLX were diverted from those required applications and used instead to pay excessive executive compensation, bonuses, perquisites, and deferred compensation to senior management of and consultants to, PHLX including Mr. Frucher and the other defendants as a result of actions taken by the "Compensation Committee."

93.     Under the financial circumstances at the PHLX at that time and as a not for profit corporation, senior management and consultants (including Mr. Frucher and the other defendants) were not entitled to the excessive payments they received.

17

94.     The Board of Governors headed by Mr. Frucher, in developing, approving and implementing the plan of demutualization in 2003 before its becoming effective in January 2004, created a new governance system for PHLX that ensured that the Members of the Board of Governors could have their terms in office extended beyond their six year limits applicable to such persons prior to demutualization, and, in so doing created an opportunity for themselves to continue to collect hundreds of thousands of dollars in fees and expenses from PHLX during such extended period.

95.     Mr. Frucher increased the compensation of Board Members and thereby influenced them to help him in exchange for giving them access to more compensation during the extended Board terms post-demutualization.  The aggregate compensation they could gain has been in the millions of dollars.

**Capital Funding Fee**

96.     From about, May 2000 through May 2003 at the behest of Mr. Frucher PHLX imposed a capital funding fee on members which generated in excess of $27,000,000 to raise funds that were allegedly needed to make technology improvements.  It is believed and therefore averred that these funds were commingled in the PHLX general fund to pay expenses, bonuses and salaries, some of which as more specifically alleged herein, were otherwise improper, and to mask the otherwise weak financial condition of PHLX.

97.     Capital funding fees were imposed at the rate of $18,000 per year per seat for three years through June 2003, concluding just prior to the beginning of demutualization activity.

98.     Plaintiff paid more than $324,000 in capital funding fees.

99.     Owners were told that the payments made by them to PHLX as capital funding fees were a capital contribution to PHLX and were not deductible against income for tax purposes.

100.    No tax opinion was shared with the owners as to the tax treatment of the capital funding fee.

101.    In late 2003, prior to demutualization, Mr. Briggs determined that even though the institution would approximately break even if there was a good November and December, that cash bonuses could be approved.  Mr. Briggs' calculation of "break even" contained an estimate of payments PHLX would need to make to settle various SEC and DOJ issues.  Although there was surplus cash as a result of the capital funding fee, it was supposedly earmarked for capital expenditures, i.e. a technology upgrade.  It is believed and therefore averred that Mr. Briggs' position as to bonuses was incorrect when the entity is a not for profit entity.

102.    Bonuses were approved in late 2003, believed to be in excess of $2,000,000, but were not to be paid out until early 2004.

103.    In January 2004, demutualization occurred, then the bonuses were paid. Significantly, after demutualization, the not for profit restrictions on payment of bonuses were not in effect.  Subsequently, after the payment of the bonuses, in a memo distributed to the PHLX Finance Committee by United States mail, telecopy and/or hand delivery dated April 19, 2004, defendant Briggs admitted that his previous estimate of monies needed for SEC and DOJ matters, and consultants for those matters, was too low by at least 700%.

104.    Mr. Frucher violated his duties as an officer of PHLX, and as a member of the Board of Governors because surplus cash was not available for the purpose of paying bonuses. In any event the payments were excessive.

105.    The seat owners, including plaintiff, who paid the capital funding fee were deceived prior to mailing those payments as to what purpose the payments were to be applied. Some owners resisted, but were threatened with expulsion and other penalties and sanctions by Mr. Frucher and his administration.

**The Price of Seats Falls**

106.    After becoming Chief Executive Officer of PHLX in 1998, defendant Frucher let it be known to the members and seat owners of PHLX that he believed seat lease fees belonged to PHLX, and not to seat owners.  Defendant Frucher also let it be known that he believed that the cost of access to trade on PHLX was too high.

107.    At the time of this action by defendant Frucher, seats traded at approximately $250,000.

108.    Many seat owners who did not use all of their own seats enjoyed income from leasing such seats because the common practice at that time was for a lessee to pay monthly between 2.0 and 2.5% of the last sales price for a seat.

109.    Mr. Frucher established an equity trading permit which had the effect of diverting owners' lease fees to PHLX, capping lease prices and thereby lowering the price of a PHLX membership.  Although the Board may have approved this action and others set forth in this complaint, Mr. Frucher exercised undue influence because of his actions to benefit Board members, and his desire to advance demutualization to reward himself, other defendants and others who benefited from their misconduct.

110.    At or about this time, at the direction of defendant Frucher, PHLX hired a consulting firm, to act as an advisor on the question of demutualization.

111.    Mr. Frucher did not disclose to seat owners that the consulting firm was to directly benefit from the successful completion of demutualization.  Material information relating to the regulatory history of, and sanctions imposed on, members of senior management, PHLX and its subsidiaries was not disclosed in the Information Memorandum relating to demutualization sent to owners by United States mail, over the Internet and/or by hand delivery.

112.    Paying an advisor who stood to profit by recommending a predetermined outcome was a waste of assets and Mr. Frucher and the members of the Board of Governors who approved or were aware of the terms and condition of the retention by PHLX of the consulting firm violated their duties as members of the Board of Governors by failing to act with due diligence.

113.    Mr. Frucher and others of the defendants, acted in May 2003 to create the prospect of reinstituting the capital funding fee on seatholders, supposed to expire in June 2003, as a way of creating leverage on Seatholders to approve demutualization.  Communications about this were distributed by United States mail and/or wire.  Mr. Frucher also traveled interstate to communicate this information.

**Board Fails to Discharge Frucher for Incompetence**

114.    In 2004, under the tenure of Mr. Frucher, the SEC and the U.S. Department of Justice cited approximately 238 compliance deficiencies with respect to the inadequate discharge of regulatory responsibilities by PHLX and it is believed and therefore averred that fines and sanctions against PHLX are under negotiation.

115.    During the tenure of defendant Frucher as Chief Executive Officer of PHLX the number of problem matters found by the SEC has been increasing.

116.    Dozens of additional surveillance officers and personnel have been employed at great expense to PHLX in an effort to make a "quick fix" of the deficiencies which developed and which have been inadequately addressed over Frucher's tenure.

117.    As the primary responsibility of the chief regulatory officer of a national securities exchange is to ensure that the conduct of Exchange members and member organizations are in compliance with the requirements of an exchange under the Exchange Act, defendant Frucher has failed to do so based on the continuing increase in the number of violations during his tenure.

118.    That failure puts at risk the qualification of the PHLX to continue as a national securities exchange.

119.    Notwithstanding Mr. Frucher's ongoing and apparently increasingly deficient performance in regard to compliance issues, his compensation and rewards and that of other senior management (including the other defendants) continues to escalate.

120.    As these regulatory and surveillance problems have been ongoing for an extended time, the Board of Governors influenced and led by Mr. Frucher has been and is negligent in performing its duties to keep PHLX in compliance with the requirements of the Exchange Act or, alternatively, the Board of Governors is being willfully blind to these problems.

121.    Either way, the conduct of defendant Frucher and the other defendants likely will result in large penalties that will be borne by the owners and members of PHLX.

122.    Even in light of the ongoing regulatory and compliance issues, the Board of Governors influenced and led by Mr. Frucher authorized large bonuses for senior management and senior staff (including the other defendants) averaging well over $1,000,000 a year since 1999.

123.    Defendant Frucher has personally benefited by receiving large salary increases, bonuses, loan forgiveness, stock awards, pension payments and expense accounts all in excess of $3,000,000.

124.    Other defendants influenced by and supportive of Mr. Frucher benefited similarly.

125.    Legal fees required to address matters set forth herein, including matters involving the SEC and the Department of Justice are believed and therefore averred to be in excess of $2,500,000.

126.    According to PHLX annual reports, its liability for pension benefits has increased by more than $10,000,000 since 1998.  Of that total pension obligation the unfunded portion increased by over 1370%.  During the same period PHLX's obligation with respect to other post-retirement benefits has risen from less than $900,000 to more than $5,200,000, all of which is noted in the audited financial statements of PHLX as being unfunded and may be in violation of ERISA.

127.    PHLX failed to enforce its own rules as an SRO to collect certain fees.  As set forth above, in 2002 QQQ specialists' fees in excess of $465,000 were due to PHLX.  Because of negligence by defendant Frucher and the other defendants, PHLX failed to collect these fees which failure benefited a business associate of a member of the Board.

128.    It is projected that PHLX on an annualized basis lost approximately $2,000,000 in permit fee revenues in the year 2004.

129.    PHLX sought to terminate a real estate lease and bought it out for in excess of $1,000,000 because of the actions required by the SEC relating to the dissolution of Philadep and restrictions imposed on the operations of SCCP.

**Frucher's Scheme to Benefit by Demutualization**

130.    Defendant Frucher's demutualization plan, as developed and executed by him and the other defendants, has cost owners over $4,000,000 to date while benefiting him and other defendants personally to the detriment of shareholders.

131.    As set forth above, prior to demutualization in 2004, PHLX was entirely owned by its seatholders.  Mr. Frucher and the other defendants were not seatholders.

132.    On February 12, 2003 Mr. Frucher reassured seatholders by United States mail, wire and/or hand delivery that there "is no intent to 'carve out' an equity stake for Management as part of the process of demutualization."

133.    On November 4, 2003 Mr. Frucher wrote an open letter to seatholders sent by United States mail, wire and/or hand delivery acknowledging that management could get up to 10% of the outstanding common stock of PHLX after completion of demutualization.

134.    The demutualization plan called for the elimination of seats and the substitution of "shares."  Each seatholder received 100 shares per seat owned at the time of demutualization. The demutualization plan anticipated distribution of shares to management.

135.    No fairness opinion was ever presented to the seatholders by the financial advisor in regard to demutualization.

136.    There is no evidence of an independent analysis of demutualization.

137.    Mr. Frucher recommended Constantine Papadakis as Chair of the Compensation Committee and subsequently Mr. Papadakis' fee for serving on that Committee was increased. Others friendly to Frucher were also appointed to the Compensation Committee and received enhanced payments for their services.

138.    The Compensation Committee sought a recommendation from the Hay Group about executive compensation.  It is believed and therefore averred that this recommendation was a result predetermined by Mr. Frucher and others.

139.    It is believed and therefore averred that the Hay Group is not independent from Mr. Frucher and his associates.

140.    The Hay Group recommended an increase in compensation for Mr. Frucher and it is believed and therefore averred that the Compensation Committee subsequently recommended that defendant Frucher be awarded shares of PHLX.  Not surprisingly, the Compensation Committee approved the Hay Group's recommendation and the PHLX Board of Governors approved the pay packages and shares for certain people, including Mr. Frucher.

141.    After Mr. Frucher received his shares of PHLX, he boasted that he was the largest single PHLX shareholder.

142.    For the first time, and against PHLX rules, and without specific authorization, a consultant and friends of Mr. Frucher, specifically including but not limited to Norman Steisel, also received shares of PHLX at no cost.

143.    Just prior to the time PHLX shares were given to Mr. Frucher and other defendants, PHLX received a lucrative proposal for the purchase of a large interest in PHLX.  Mr. Frucher was aware of this proposal for several months.  That proposal was kept secret from the shareholders of PHLX.

144.    Mr. Frucher declined the offer because it is believed and therefore averred, he had not yet obtained PHLX shares for himself so he would not benefit from the proposed deal.

145.     On April 21, 2005, PHLX announced it had rejected that offer for $50,000,000 to buy PHLX itself.  It would have been paid for by a combination of cash and stock in a publicly traded company.

146.     On June 16, 2005 PHLX issued a news release that disclosed there were two investors that were each acquiring 10% of PHLX with the option to acquire more.  It was announced that Merrill Lynch and Citadel each made a strategic investment and received at least 10% of PHLX.

147.     On August 16, 2005, the PHLX issued a news release that announced further investments in PHLX and announcing that 20% would be given to the new investors.  It was announced that CitiGroup, CSFB, MorganStanleyDeanWitter and UBS also made strategic investments receiving an additional 20% of PHLX.

148.     At the same time PHLX offered to shareholders who previously owned seats, subject to certain contingencies, $90,000 per 100 shares issued in exchange for their seat to purchase their interests.

149.     It was only after Mr. Frucher received a commitment for shares of PHLX for himself, the other defendants and other members of senior management, did he entertain proposals for any purchase of PHLX shares.

150.     Importantly, these strategic investments were of a different nature than the previously undisclosed $50,000,000 purchase offer turned down by Mr. Frucher.  The difference between the deals is that if the $50,000,000 offer had been accepted, the shareholders would have received money for their interest.

151.     Additionally, another contemporaneous offer was made to PHLX by a well-funded Member and owner of PHLX to purchase for cash 20% of the then-existing undiluted

shares for the equivalent of $200,000 for each 100 shares.  Mr. Frucher told the Member that it was too late, the deals had already been made.  This bid was approximately 1.66 times the bid accepted by Mr. Frucher.

152.    None of these deals were presented to existing shareholders for review, comment or approval, rather the deals were presented as a fait accompli, notwithstanding statements made by Mr. Frucher to shareholders by United States mail and/or wire that any deals would be presented to shareholders for comment, review and approval.

153.    On information and belief neither of the deals accepted by Mr. Frucher were as lucrative for PHLX or its then-shareholders as the deals turned down by Mr. Frucher before he received his commitment for PHLX shares so he and the other defendants could benefit personally from the transaction.

154.    PHLX by-laws provide that a director shall recuse him or herself from deliberation of any matter in which he or she is personally interested.  Notwithstanding this prohibition and his equitable ownership of a large amount of shares, Mr. Frucher has been the principal advocate and maker for the deals set forth above.

**Hiring Friends to Serve as Consultants**

155.    In 1999, defendant Frucher, without making any showing that a similarly or better qualified person was not available from within the Philadelphia area, hired a friend, defendant Norman Steisel ("Steisel"), to perform services for PHLX as a consultant.  Mr. Frucher and Mr. Steisel formerly worked together in New York.

156.    While under contract as a consultant, and not an employee of PHLX, Steisel was represented to be a PHLX Senior Executive with indicia of employment conferred upon him.

157.    In 2003 alone Steisel received a bonus from PHLX in excess of $80,000 and total compensation of $272,833.07 and had been compensated in prior years in a similar manner. There is no provision in his consulting agreement to receive bonuses.

158.    In 2005, notwithstanding his status as a consultant, and without payment by him, Mr. Steisel received shares of PHLX awarded by the Board of Governors upon the recommendation of the Compensation Committee, which was unduly influenced by Mr. Frucher and other defendants.

159.    Plaintiff knows of no provision in PHLX articles of incorporation or By-Laws allowing such award of shares.

160.    Mr. Steisel, like Mr. Frucher, is a resident of New York City.  In addition to compensation, both Mr. Frucher and Mr. Steisel are paid for travel expenses and also given an expense account for meals and lodging.  Mr. Frucher stays on Rittenhouse Square when he is in Philadelphia, Mr. Steisel stays near the Square.

161.    Because PHLX is strapped for cash, expenditures made for Mr. Steisel are wasteful.

**Certain Board Members and Others Benefit by Supporting Mr. Frucher's Actions**

162.    Various Board Members and others have personally benefited by supporting Mr. Frucher's scheme.  For example, including but not limited to, large sums paid to attend Board and Committee meetings, inside information about deals meant to enhance share value so that Board Members and others could benefit to the detriment of shareholders by purchasing seats/shares in anticipation of such actions.

163.     At least one PHLX Board Member has been sued at Feinberg v. I. Isabelle Benton, EDPA Civil Action No. 05-04847, for allegedly using confidential information gained as a Board Member to benefit herself at the expense of other shareholders of PHLX.

164.     Meetings of the Board include participation by telephone of out of state or otherwise unavailable Board Members.  These Board Members reap thousands of dollars per year as a result of Mr. Frucher's influence for their services to the Board.

**The Cover-Up**

165.     Minutes of meeting of Members and various committees are either not kept at all, altered or destroyed to keep shareholders of PHLX from discovering the acts of Mr. Frucher and the other defendants.

166.     Meetings are not scheduled for shareholders to share information.  Mr. Frucher has previously declared that he was "going to run this place from the top down" and that he didn't want to be bothered by committees.

167.     At a recent election a Member, a partner of plaintiff herein, submitted an independent nomination for the Board of Governors.  That independent nomination contained more than sufficient signatures to secure a position on the ballot.  That Member was not one of Mr. Frucher's inner circle.

168.     After the close of the nominating process, and after that Member submitted his nominating petition to the Secretary's office, the candidate was informed that a number of the signatories to the petition were removed by e-mail reducing the number of names to below the number needed for nomination.  These removals were only minutes before the certification process of the Nominating Committee was to take place.  The Member was then informed his

nomination would not be accepted because of an insufficient number of signatures to his

nominating petition.

169.    The signatories of the nominating petition were counted and acknowledged by the

Exchange corporate secretary prior to the closing deadline to submit such nomination and prior

to the removal of the signatures.

170.    The Member, having been deprived of his right to be on the ballot, lodged a

protest and requested a hearing.  At that hearing, PHLX refused to supply the details of the names

removed or the justification for the removal of the names after the close of the nominating

process.

171.    Through this perversion of the corporate processes put in place to govern PHLX,

Mr. Frucher and the other defendants effectively control the flow of information and the inability

for Members to discover and protest the actions of defendants.

**Retaliatory Acts**

172.    Plaintiff and its partners have been subjected to various retaliatory acts by or at the

direction of defendants including but not limited to being subjected to baseless and harassing

regulatory investigations and inquiries by PHLX staff with respect to conduct by plaintiff and its

partners which have been long accepted and approved by PHLX and the SEC.

173.    On Monday December 19, 2005 at a scheduled Members meeting, for the first

time Mr. Frucher announced that the equity trading floor of the PHLX would be closed in or

about June 2006.  Mr. Frucher further announced that the equity specialist system "had died."

Penn Mont operates its business and trades on the equity floor.  These various regulatory actions

constitute harassment and retaliation for plaintiff's exercising its rights as a member, seat owner

and/or shareholder to challenge what plaintiff believes are wrongful acts not in the best interest of PHLX, but taken to benefit defendants and their associates.

174.    It is believed and therefore averred that such investigations and inquiries are to punish plaintiff for questioning the acts of defendants, and to injure plaintiff's credibility should plaintiff undertake to challenge defendants further.

## COUNT ONE

### CIVIL RICO

175.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

176.    Defendants are "persons" as set forth and defined in 18 U.S.C. § 1961(3).

177.    From at least 1998 until the present, defendants, and other unnamed individuals were an ongoing association-in-fact within the meaning of 18 U.S.C. § 1961(4), which functioned for the common purpose of enriching the members thereof through PHLX at the expense of the plaintiff.  This association –in-fact was an "enterprise" as set forth and defined in 18 U.S.C. § 1961(4) which was engaged in, and the activities of which affected, interstate commerce.  Alternatively, the defendants were an association-in-fact operating through the enterprise of PHLX.

178.    Frucher was hired by PHLX and with other defendants proceeded to implement organizational changes of PHLX to the detriment of the owners and Members, prior to demutualization, and now shareholders after demutualization.

179.    It is believed and therefore averred that Frucher and other members of the enterprise including defendants at his direction and in concert with him, deliberately and

wrongfully implemented changes to PHLX that would benefit Frucher, the defendants and others to the detriment of PHLX and its Members and shareholders.

180.    Defendants' purpose as an enterprise was to wrongfully shift shares and monies of PHLX to Frucher and others including defendants so they could enrich themselves by the deals made purportedly for the benefit of PHLX and its shareholders when in actuality the only deals done were those which benefited defendants and not necessarily those deals in the best interests of PHLX and its shareholders.  Alternatively defendants purpose was to control the enterprise PHLX through their actions.

181.    It is believed and therefore averred that Frucher declined more lucrative proposals from entities interested in doing business with PHLX because at the time the proposal was made Frucher and other members of the enterprise including the defendants did not own shares of PHLX.

182.    Frucher engineered a grant of shares in PHLX to himself and selected others, including other defendants who acceded to his plan and subsequently accepted proposals that would enrich him at the expense of long time legitimate shareholders of PHLX.

183.    The defendants' typical method of operation was to use fraud, conspiracy, misrepresentation and other unlawful acts to manipulate plaintiff's accounts and property and thereby enrich defendants, and further their scheme by acts including, but not limited to, the actions set forth above.

<u>The Pattern of Racketeering Activity</u>

184.    From at least 1998 and continuing through the present, in violation of 18 U.S.C. § 1962(c), defendants, as persons associated with the enterprise PHLX, that affected interstate commerce, conducted and participated in the affairs of the enterprise as aforementioned through

a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in furtherance of their schemes to defraud plaintiff.

185.    From at least 1998 and continuing through the present, in violation of 18 U.S.C. § 1962(a), defendants, as persons who have received income derived directly or indirectly from a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in which defendants have participated as a principal within the meaning of 18 U.S.C. § 2, have used or invested, directly or indirectly, part of such income, or the proceeds of such income, in the acquisition of interest in and operation of PHLX, an enterprise engaged in and whose activities affect interstate commerce, all in furtherance of their schemes to defraud plaintiff.

186.    From at least 1998 and continuing through the present, in violation of 18 U.S.C. § 1962(b), defendants, through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) acquired and maintained, directly and indirectly an interest in and/or control of PHLX, an enterprise engaged in and whose activities affect interstate commerce, all in furtherance of their schemes to defraud plaintiff.

187.    Such pattern of racketeering activity described above included violations of 18 U.S.C. § 1343, wire fraud; 18 U.S.C. § 1341, mail fraud; 18 U.S.C. § 1957, engaging in monetary transactions derived from unlawful activity; 18 U.S.C. § 1512 retaliation and intimidation, securities fraud and other illegal acts as set forth in this complaint.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of itself for in excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of $1,000,000 and against defendants jointly and severally as for actual, compensatory and consequential damages according to proof; for treble damages against defendants jointly and severally, in an amount sufficient to punish defendants and deter others from similar

wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require.

## COUNT TWO

### RICO CONSPIRACY

188.     Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

189.     Defendants knowingly, willfully and intentionally entered into a conspiracy among themselves and others unnamed as defendants to participate directly and indirectly in the affairs of the enterprise referred to above.  Each defendant agreed to the commission of certain of the overt racketeering activity as set forth.  In violation of 18 U.S.C. § 1962(d), all defendants conspired to violate 18 U.S.C. § 1962(c) in that all agreed to commit the aforesaid predicate acts of wire fraud, mail fraud, engaging in monetary transactions derived from unlawful activity, and retaliation and securities fraud with knowledge that such acts were part of a pattern of racketeering activity.

190.     As a result of the foregoing conspiracy, plaintiff has been injured in its business and property in an amount in excess of $1,000,000 as a result of defendants' fraud, conspiracy, misrepresentation and other unlawful acts.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of itself for in excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of $1,000,000 and against defendants jointly and severally as for actual, compensatory and consequential damages according to proof; for treble damages against defendants jointly and severally, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for

such other, different or further relief as the interests of justice or equity may require.

## COUNT THREE

### DIRECT SHAREHOLDER'S ACTION FOR BREACH OF FIDUCIARY DUTY

191.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

192.    From 1998 through the present, Mr. Frucher and one or more of the other defendants and others unnamed herein have controlled the Board of Governors of PHLX by acts as set forth above.

193.    In doing so, the defendants have violated the requirements of PHLX's by-laws in the ways set forth herein.

194.    As Chairman and now shareholder of PHLX through the aforesaid means, defendants owed the other shareholders of PHLX a fiduciary duty to operate PHLX in a loyal and non-negligent manner for the benefit of all shareholders collectively.

195.    As is set forth in detail herein the defendants have committed breach of trust and fiduciary duty, willful and/or negligent mismanagement and malfeasance in the control of the affairs, interests and transactions of PHLX.

196.    As the owners and members fund PHLX, defendants owed a duty to plaintiff to use care in its governance of PHLX.  Defendants are fiduciaries who should have acted in the best interests of PHLX and its owners and members.

197.    Defendants have willfully and deliberately and/or negligently breached their fiduciary duties to the plaintiff and to all other similarly situated owners by the practices set forth in the complaint, which are not inclusive but solely for purposes of illustration.

198.    The Board of Governors, controlled by Mr. Frucher, knew that appropriate action by it within the scope of its duties was necessary to prevent or rectify the breach of a fiduciary duty owed by it to plaintiff because the breach was negligence or a fraud on PHLX and/or the defendants assisted the breach.

199.    Plaintiff was not reasonably able to protect its rights for the reasons set forth above.

200.    Discharge of a duty to use care would not have significantly impaired the performance of the Board, and would have been of material value and benefit to PHLX and its members, but would have decreased the amount of money defendants gained from PHLX by their actions.

201.    As a result of Frucher and the defendants' actions, plaintiff and all other owners were damaged by, including, but not limited to, loss of corporate assets, reduction in PHLX's net worth, impairment of PHLX's future growth potential and loss of goodwill.

202.    Every similarly situated person during the relevant period suffered the same type of damages although the amount each suffered depended upon the number of seats owned by each such person.

203.    The conduct of defendants was deliberate, willful, wanton and outrageous, entitling plaintiff to an award of punitive damages.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of itself for in excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of $1,000,000 and against defendants jointly and severally as for actual, compensatory and consequential damages according to proof; for punitive or exemplary damages against defendants jointly and severally, in an amount sufficient to punish defendants and deter others from similar

36

wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require.

## COUNT FOUR

## DERIVATIVE ACTION FOR BREACH OF FIDUCIARY DUTY

204.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

205.    This Count is a derivative cause of action which plaintiff brings in the name of PHLX on behalf of all other similarly situated shareholders for breach of fiduciary duty.

206.    As is set forth in detail herein the defendants have committed fraud, gross neglect and inattention, breach of trust and fiduciary duty, willful and fraudulent mismanagement and malfeasance in the control of the affairs, interests and transactions of PHLX.

207.    The defendants have willfully and deliberately breached their fiduciary duties to the plaintiff and to all other similarly situated shareholders by the practices set forth herein, which are not inclusive but solely for purposes of illustration and including but not limited to:

      a.    Misappropriating corporate assets by engaging in transactions to benefit defendants and, it is believed and therefore averred, paying personal expenses from PHLX's limited resources;

      b.    Improperly rejecting deals proffered to PHLX because the terms of those deals did not benefit defendants.

      c.    Engaging in deceptive practices, ongoing and continuous employee and shareholder threats, employee sexual harassment and defamation and the creation thereby of an ongoing hostile environment.

208.    No demand has or could have successfully been made upon the Board of Governors of PHLX to institute this action because the individual defendants who control the Board of Governors committed the acts which are the subject of this action.   By reason of the foregoing, any demand by the plaintiff that PHLX commence this action in its own right would have been and is futile.

209.    Nevertheless, plaintiff made at least two demands for Mr. Frucher to resign and for PHLX to address defendants' bad acts.  Each demand was either ignored or refused.

210.    One individual affiliated with plaintiff made demand at a PHLX shareholder meeting for Mr. Frucher to submit his resignation.  Mr. Frucher declined.

211.    As a result of the foregoing misconduct by defendants, PHLX (and all its shareholders collectively) have suffered damages, including but not limited to loss of corporate assets, reduction in PHLX's net worth, impairment of PHLX's future growth potential and loss of goodwill.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of themselves for in excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of $1,000,000 and against defendants jointly and severally as for actual, compensatory and consequential damages according to proof; for punitive or exemplary damages against defendants jointly and severally, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require.

## COUNT FIVE

## BREACH OF CONTRACT

212.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

213.    As set forth in this complaint a contract existed between plaintiff and PHLX that was breached by the individual defendants operating PHLX as set forth above and in the following paragraphs.

214.    The Individual Defendants have violated the Code of Conduct of PHLX.

215.    The Individual Defendants have violated the By-Laws of PHLX by failing to promote the welfare, objects and purposes of the Exchange and in other ways as set forth below.

216.    Under Sec. 13-5 of the By-Laws the Individual Defendants are personally liable and can be disciplined under Article XVIII.

217.    The Individual Defendants have also violated articles of the PHLX Certificate of Incorporation including Articles Third and Fourteenth and are personally liable pursuant to Article Eighteenth of the Certificate.

218.    Plaintiff, to date, has incurred $340,000 in legal fees.

219.    Defendants purposefully acted specifically intending to breach the existing relationship between plaintiff and the PHLX or without concern for that relationship.

220.    Defendants had no privilege or justification for their acts.

221.    Every similarly situated person during the relevant period suffered the same type of damages although the amount each suffered depended upon the number of seats owned by each such person.

222.    Plaintiff suffered actual legal damages as a result of defendants' conduct.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of itself for in excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of $1,000,000 and against defendants jointly and severally as for actual, compensatory and consequential damages according to proof; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require.

## COUNT SIX

### CONVERSION

223.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

224.    Defendants interfered with plaintiff's ownership and/or right to possession of its interests in PHLX.

225.    Defendants interfered through its wrongful control of plaintiff's property. Plaintiff suffered actual damage.

226.    The conduct of defendants was deliberate, willful, wanton and outrageous, entitling plaintiff to an award of punitive damages.

227.    Every similarly situated person during the relevant period suffered the same type of damages although the amount each suffered depended upon the number of seats owned by each such person.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of itself for in excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of $1,000,000 and against defendants jointly and severally as for actual, compensatory and consequential damages according to proof; for punitive or exemplary damages against defendants

40

jointly and severally, in an amount sufficient to punish defendants and deter others from similar

wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for

such other, different or further relief as the interests of justice or equity may require.

## COUNT SEVEN

### FRAUD

228.     Plaintiff realleges and incorporates herein by reference each of the allegations

contained in the preceding paragraphs of this Complaint.

229.     The above described activities by defendants, and each of them, constitute fraud

in that defendants made, or permitted or participated in the making of materially false and

misleading statements which were fraudulently and deceitfully made, and actively concealed and

suppressed material information from plaintiff and others.

230.     Plaintiff and others justifiably relied on defendants to inform them of information

in their possession that caused and/or brought harm to plaintiff and PHLX.  As a proximate result

of defendants' fraudulent and deceitful misrepresentation and concealment of material facts

described above, plaintiff and others have been damaged.

231.     Every similarly situated person during the relevant period suffered the same type

of damages although the amount each suffered depended upon the number of seats and/or shares

owned by each such person.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of itself for in

excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of

$1,000,000 and against defendants jointly and severally as for actual, compensatory and

consequential damages according to proof; for punitive or exemplary damages against defendants

jointly and severally, in an amount sufficient to punish defendants and deter others from similar

wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require.

## COUNT EIGHT

### FRAUDULENT CONCEALMENT

232.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

233.    Defendants had a duty to disclose the material facts known to or knowable by them relating to the information in their possession that caused and/or brought harm to PHLX. This duty arose in part from the defendants' superior knowledge concerning, and active, wanton and willful suppression of information regarding the true facts of expenditures or receipt of offers to purchase shares of PHLX made on behalf of PHLX.

234.    By intentionally concealing material facts, defendants intended to defraud plaintiff and others and to force plaintiff and others to pay for or reimburse these expenditures and/or suffer share dilution to the benefit of defendants.  Plaintiff and others were unaware of the concealed facts, and would not have acted as they did had the defendants disclosed the intentionally concealed material facts set forth above.

235.    As a result of defendants' acts of fraudulent concealment, plaintiff and others have been damaged.

236.    Every similarly situated person during the relevant period suffered the same type of damages although the amount each suffered depended upon the number of seats owned by each such person.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of itself for in excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of

$1,000,000 and against defendants jointly and severally as for actual, compensatory and consequential damages according to proof; for punitive or exemplary damages against defendants jointly and severally, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require.

**COUNT NINE**

**NEGLIGENCE**

237.     Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

238.     Defendants owed a duty to plaintiff to use ordinary care to prevent plaintiff and others similarly situated from being injured as a result of defendants' conduct.

239.     Defendants breached that duty by their negligent actions and omissions, including but not limited to their conduct as set forth above.

240.     Plaintiff and others were injured and suffered damages as a result of the negligence including paying excessive and unnecessary expenses as set forth above.

241.     The results of these negligent actions and omissions were or should have been foreseeable to the defendants.  Defendants were aware of the breaches of duty of the other defendants and participated in those breaches of duty.

242.     For a time, plaintiff and others were unaware of defendants' negligence, including negligent misrepresentations or omissions, because defendants actively suppressed the information and plaintiff and others acted in reliance on defendants' statements and their omission of disclosure of material information concerning expenditures.

243.    Plaintiff and others were justified in relying on defendants' representations and omissions because defendants had actively suppressed and therefore made unavailable the details regarding the expenditures.

244.    As a result and because defendants acted wrongfully in callous disregard of the rights and interests of plaintiff and others, plaintiff and others are entitled to damages as set forth herein.

245.    As a proximate result of the conduct of defendants, and each of them, plaintiff and others reimbursed the expenditures and were economically damaged by paying substantial monies that they may not have paid had they known the true facts and suffered dilution in the value of their shares.

246.    Every similarly situated person during the relevant period suffered the same type of damages although the amount each suffered depended upon the number of seats owned by each such person.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of itself for in excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of $1,000,000 and against defendants jointly and severally as for actual, compensatory and consequential damages according to proof; for punitive or exemplary damages against defendants jointly and severally, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require.

## COUNT TEN

## UNJUST ENRICHMENT

247.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

248.    Defendants benefited themselves by their actions as set forth in this complaint.

249.    Defendants knew or should have known of those benefits.

250.    For defendants to retain any benefits from their actions as alleged would be inequitable.

251.    Defendants should be estopped from benefiting in any way, including unjust enrichment, for its actions as set forth in this complaint.

252.    Every similarly situated person during the relevant period suffered the same type of damages although the amount each suffered depended upon the number of seats owned by each such person.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of itself for in excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of $1,000,000 and against defendants jointly and severally as for actual, compensatory and consequential damages according to proof; for punitive or exemplary damages against defendants jointly and severally, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require.

## <u>COUNT ELEVEN</u>

## DISGORGEMENT

253.    Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

254.    Defendants have and retain property and funds of plaintiff and retain it wrongly.

255.    Defendants should be compelled to disgorge all funds of plaintiff because to retain them would be unfair.

WHEREFORE, plaintiff respectfully requests relief and judgment in favor of itself for in excess of $1,000,000 and as a derivative claim in favor of the owners of PHLX for in excess of $1,000,000 and against defendants jointly and severally as for actual, compensatory and consequential damages according to proof; for punitive or exemplary damages against defendants jointly and severally, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require.

Respectfully submitted,

_____
Lynanne B. Wescott, Esquire
Identification No. 52928
239 S. Camac Street
Philadelphia, PA 19107
Tel:  (215) 545-0324
Fax:  (215) 545-0326

Attorney for Plaintiff

Dated: December 22, 2005