**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PENN MONT SECURITIES | : | CIVIL ACTION |
| and its partners, | : | |
| | : | |
|     Plaintiffs, | : | |
| | : | |
|       v. | : | NO. 05-CV-6686 |
| | : | |
| MEYER S. FRUCHER, et al., | : | |
| | : | |
|     Defendants. | : | |

## MEMORANDUM AND ORDER

Anita B. Brody, J.                                          August 15, 2007

PennMont Securities ("PennMont") filed this putative class action against defendants Meyer "Sandy" Frucher, William N. Briggs, Norman Steisel, Kevin Michael Foley and Christopher Nagy ("defendants"), for violations of federal racketeering law and state tort law arising out of defendants' alleged mismanagement of the Philadelphia Stock Exchange ("PHLX" or "the Exchange") and demutualization of the Exchange in 2004.[1]  Defendants were or are employees and/or officers of PHLX.

PennMont asserts eleven claims: (1) civil RICO; (2) RICO conspiracy; (3) breach of fiduciary duty ("direct claim"); (4) breach of fiduciary duty ("derivative claim"); (5) breach of contract; (6) conversion; (7) fraud; (8) fraudulent concealment; (9) negligence; (10) unjust enrichment; and (11) disgorgement.  Before me is defendants' motion to dismiss.

---

[1]"Demutualization" is the conversion of a mutual non-profit organization into a for-profit corporation, which issues stock.  81 S.E.C. Docket 3460, 2004 WL 96703, *1 (Jan. 16, 2004) (order approving proposed rule-change implementing demutualization).

1

**Background**

A.     Overview

PennMont is a partnership based in Paoli, Pennsylvania and has been a member of PHLX since December 19, 1981.  Compl., ¶ 1.  PHLX is the oldest stock exchange in the country.  Id., ¶ 7.  From 1972 to 2004, PHLX operated as a non-profit mutual organization incorporated under Delaware state law.  Id., ¶ 8.  PHLX was comprised of 505 seats, of which Penn Mont owned approximately five.  Id., ¶ 2.  Seat holders were entitled to do business on the Exchange, and they also could earn revenue by renting or leasing their seats to others.  Id., ¶ 27-28.

Prior to demutualization, PHLX's nonprofit status prohibited it from paying dividends or issuing stock.  Id., ¶ 10.  Members and seat holders paid fees to cover PHLX's operating costs.  Id. at 11.  PennMont alleges that seat holders had a contractual relationship with the Exchange based on the PHLX Certificate of Incorporation, PHLX By-Laws, and the PHLX Code of Conduct.  Id., ¶ 12.

Sandy Frucher became the Chief Executive Officer of PHLX and Chairman of the Board of Governors ("the Board") in 1997.  Id., ¶ 14.  Briggs has served as an employee and officer of PHLX for many years.  Frucher hired Steisel as a consultant in 1999, and Steisel now is a "Senior Executive" of PHLX.  Id., ¶ 16.  Foley served as Chair of the Board's Demutualization Advisory Group.  Id., ¶ 17.  Nagy was Off Floor Vice Chairman and a member of the Board and the Demutualization Advisory Committee.  Id., ¶ 18.  Under Frucher's tenure, defendants allegedly engaged in continuous misconduct, which diminished the value of PHLX seats and harmed seat holders.  Id., ¶ 4.  Defendants' alleged misconduct culminated in demutualization in January 2004, which diluted Penn Mont's ownership interest in the Exchange, and enriched defendants

and their allies.

B.      Prior State Court Action

In 1998, PennMont and a member, Joseph Carapico, brought an action against PHLX and its directors in the Philadelphia County Court of Common Pleas for an injunction to prevent the sale of PHLX's assets to the American Stock Exchange.  Def.'s Ex. D (State Action Compl.). The trial court denied the injunction, but the sale did not occur.  In September, 2003, PennMont filed an amended complaint in the same action and against moved for an injunction, this time to prevent PHLX from undergoing demutualization.  Def.'s Ex. E (First Am. Compl.).  PennMont reiterated many of the same allegations it has asserted in the current federal action.  On November 17, 2003, the Court of Common Pleas denied the preliminary injunction.  Def.'s Ex. F (Ct. Com. Pl. order).

Defendants filed for summary judgment.  Plaintiffs submitted a document entitled, "Findings of Fact and Conclusions of Law," in which they asserted new claims for money damages.  On October 6, 2004, the Court of Common Pleas granted defendants' motion for summary judgment and dismissed plaintiffs' claims with prejudice.  Def.'s Ex. L (Ct. Com. Pl. op.).   The Court of Common Pleas ruled that PennMont had failed to timely contest the SEC's order approving rule-changes associated with demutualization.  Id., p. 3.  It further ruled that it had no authority to enjoin demutualization because, "Congress implicitly preempted this court from undermining the SEC's authority and from entering orders contrary to those of the SEC." Id., p. 4.  The Court of Common Pleas also barred plaintiffs from prosecuting "new" claims for damages because (1) changing the direction of the litigation at that juncture would prejudice defendants; (2) plaintiffs' new claims "may" violate the statute of limitations; and (3) plaintiffs'

new claims were derivative and sought damages, but that plaintiffs had not met the standing requirements to prosecute derivative claims.  Id., p. 7.

Plaintiffs filed a motion for reconsideration, and leave to amend their complaint.  Def.'s Ex. K (civil docket), p. 29, Ex. N (proposed Sec. Am. Compl.).  The proposed second amended complaint asserted claims for breach of fiduciary duty, breach of contract, conversion, fraud, fraudulent concealment, negligence and unjust enrichment.  On November 3, 2004, the Court of Common Pleas denied plaintiffs' motion for reconsideration and denied them leave to amend the complaint.  Plaintiffs appealed to the Superior Court.  On February 27, 2006, the Superior Court affirmed both the grant of summary judgment and the denial of leave to amend the complaint.  Def.'s Ex. M, p. 7 (Super. Ct. op.).  The Superior Court ruled that appellants had waived their right to contest demutualization because they never appealed the lower court's order denying the preliminary injunction, and they failed "to follow the protocol for challenging the SEC's ratification of the [demutualization] plan."  Id., p. 6.  The Superior Court further ruled: "Appellants' inaction with regard to the lower court's denial of their request for injunctive relief resulted in preemption of this matter by the SEC."  Id., pp. 6-7.  Having "acquiesced" to the lower court's judgment, appellants could not press their claims, whether at law or at equity.  Id., p. 7.

The Superior Court also affirmed the lower court's denial of leave to amend.  The Superior Court ruled that leave to amend should be liberally granted, but not "'where it will present an entirely new cause of action or unfairly surprise or prejudice the opposing party.'"  Id., p. 5 (citations omitted).  Leave to amend also should not be granted, the Superior Court reasoned, if the party seeking leave "'will be unable to state a claim on which relief could be granted.'"  Id.

4

The Superior Court further ruled that, "Appellants' argument founders on their inability, even with amendments, to state an actionable claim." Id.  Appellants were unable to state a claim because appellants had acquiesced to demutualization, and their causes of action, "past, present, and proposed, emerge[d] either directly or indirectly out of their opposition to demutualization . . . ." Id., p. 5.  As a result, the Superior Court affirmed the lower court.

C.    Federal Complaint

In 2005, Penn Mont filed a federal complaint in this case purportedly on behalf of itself, all shareholders of PHLX, and also on behalf of PHLX.  The complaint asserts the same state law claims presented in the proposed state court second amended complaint, in addition to claims under civil RICO.  18 U.S.C. § 1964(c); compare Def.'s Ex. N, ¶¶ 151-199, with Compl., ¶¶ 175-255.

Mismanagement of Subsidiaries

The earliest allegations of misconduct in the federal complaint relate to PHLX's decision to grant generous severance packages to former officers accused of wrongdoing.  Former PHLX officers – not named as defendants in this action – allegedly mismanaged PHLX's two subsidiaries, the Philadelphia Depository Trust Company ("Philadep"), and a clearing corporation, Stock Clearing Corporation of Philadelphia ("SCCP").  Timothy J. Guiheen, former president of Philadep and SCCP, and Nicholas Giordano, former president and CEO of PHLX, allegedly transferred funds from Philadep's and SCCP's general corporate funds to PHLX to cover PHLX's "short-term cash deficits."  Compl., ¶ 71.  Mingling the subsidiaries' revenues with PHLX's general funds allegedly violated federal law, and Guiheen and Giordano's misconduct led to regulatory investigations by the Securities and Exchange Commission and the

Department of Justice.  At Frucher's direction, unspecified persons nonetheless offered "golden parachutes" to both Guiheen and Giordano.  Id., ¶¶ 75, 79.  PHLX also "bought out" a real estate lease for $1,000,000 because the SEC required PHLX to dissolve Philadep and restrict operations of SCCP.  Id., ¶ 129

Conflicts of Interest and Corporate Waste

According to PennMont, under Frucher's tenure, conflicts of interest and self-dealing abounded.  Frucher "controlled" the Nominating Committee, which was responsible for recommending appointments to the Compensation Committee.  Id., ¶ 91.  PHLX paid Board members handsomely for participating in meetings, and Frucher made Board members beholden to him by raising their stipends for serving on the Compensation Committee.  Id., ¶ 95.  Frucher and the Board also extended the length of permissible terms of service so Board members could collect fees and expenses from PHLX for a longer period of time.  Id. ¶ 94.

As Penn Mont tells it, defendants approved excessive compensation for themselves and the Board, including bonuses and severance packages for their friends, which depleted PHLX's dwindling assets.  Penn Mont alleges that Frucher violated his duties as an officer and board member by advocating such excessive payments.  Id., ¶ 92.  In 1999, Frucher hired his friend, defendant Steisel, to serve as a consultant for PHLX.  Id., ¶ 156.  In 2003, Steisel received a bonus of over $80,000 and total compensation exceeding $272,000.  Id., ¶ 157.  Frucher and Steisel live in New York City, but they stay in Rittenhouse Square when they come to Philadelphia.  Id., ¶ 160.  Penn Mont alleges that Frucher and Steisel's lavish expenditures on travel, meals and lodging have wasted PHLX's limited resources.

Between 2000 and 2003, PHLX imposed a "capital funding fee" on its members,

purportedly to fund technology improvements.  Penn Mont paid $324,000 in such fees.  Id., ¶ 98.

Instead of financing a technological upgrade, however, defendants allegedly commingled this

money with PHLX's general funds and diverted the money to pay bonuses and salaries.  Id., ¶¶

96-99.  Owners "were told," though the complaint does not specify by whom or when, that the

capital funding to PHLX was not tax deductible.  Id., ¶ 99.

In 2003, Briggs allegedly approved cash bonuses after estimating PHLX's liability for

settlement payments to the DOJ and the SEC.  In 2004, PHLX paid over $2,000,000 in bonuses,

after which Briggs distributed a memo to the PHLX Finance Committee, admitting that his

previous estimate of funds needed to pay legal fees to settle federal investigations was about

700% lower than needed.  Id., ¶ 23.[2]  PHLX's legal fees for these matters exceeded $2,500,000.

Compl., ¶ 23.

PHLX allegedly lost significant revenue from option trading because of a conflict of

interest involving Nagy.  Nagy served as both a member of the PHLX Board and a Director of

Trading of Ameritrade Clearing Inc.  Id., ¶ 56.  In his position with Ameritrade, Nagy had the

ability to "order flow" to the NASDAQ's index of the 100 largest non-financial companies,

known as the "QQQ" index,[3] and to direct trades to PHLX.  Id.  Penn Mont alleges that Frucher

and then-Acting Chairman John Wallace, not a defendant, devised a scheme by which Nagy

"and/or" Ameritrade would send trades to PHLX.  Heard & Company, a PHLX member with

---

[2] The Briggs memo estimated expenses at $3.1 million and referred to an original estimate
of $500,000.  Def.'s Ex. C (Briggs memo).

[3] See NASDAQ Indexes,
http://dynamic.nasdaq.com/services/indexes/ViewIndexes/Nasdaq_100.aspx?symbol=IXNDX
(last visited August 13, 2007).

exclusive rights, would pay Ameritrade directly for those orders.  Id., ¶¶ 56-57.  Frucher then

diverted PHLX's revenue[4] from the trades to Heard to fund its payments to Nagy "and/or"

Ameritrade.  Id., ¶ 57.  The SEC found PHLX in violation of various regulations for this scheme.

Id., ¶ 58.  The PHLX Board subsequently waived fees owed by Heard to PHLX in the amount of

$500,000, on Frucher's and Nagy's recommendation, purportedly because PHLX had failed to

collect the fees to-date because of a computer glitch.  Id., ¶¶ 59-60.  Penn Mont projects that this

cost PHLX approximately $2,000,000 in 2004.  Id., ¶ 128.  An unidentified person then

nominated a Heard employee to the Board.  RICO Case Statement, p. 15.

According to the complaint, Frucher led a campaign of anti-competitive conduct by

paying specialists with money assessed against registered option traders, allegedly in violation of

the Securities Act of 1975.  Id., ¶¶ 43-44.  Briggs assisted Frucher in setting fixed fees instead of

permitting brokers and dealers to negotiate rates themselves.  Id.  Frucher also allegedly failed to

monitor PHLX's compliance with federal regulations.  As a result, the SEC and DOJ found

numerous instances of regulatory noncompliance.  In 2004, for example, the SEC and DOJ cited

238 compliance deficiencies at PHLX, with fines and sanctions against PHLX yet to be

determined.  Id., ¶ 114.  Frucher's alleged failure to ensure PHLX's compliance threatens

PHLX's continuing eligibility as a national securities exchange.  As a consequence, PHLX has

employed "dozens" of additional personnel to provide a "quick fix" for the deficiencies that

Frucher has ignored.  Id., ¶ 116.  Despite Frucher's alleged incompetence and PHLX's

compliance woes, the Board has approved compensation for Frucher in excess of $3,000,000,

---

[4]This revenue was "tape revenue," which refers to "fees paid by reporting services for
information on transactions that occurred on PHLX."  Compl., ¶ 11.

over an unspecified period of time.  Id., ¶ 123.

Penn Mont alleges that Frucher "dominated" all levels of decisionmaking on matters of executive compensation.  For example, the Compensation Committee sought input about executive compensation from an entity known as the Hay Group, but Penn Mont alleges that the Hay Group simply did Frucher's bidding.  Id., ¶¶ 137-140.  Not surprisingly, the Hay Group allegedly recommended increasing Frucher's compensation, and the Compensation Committee subsequently recommended awarding shares of PHLX to Frucher.  Id.

Penn Mont alleges that Frucher exercised "undue influence" by courting the Board with enhanced compensation and the prospect of enriching themselves through demutualization.  Id.

At an unspecified time, Frucher instituted an equity trading permit system that depressed seat rents by capping lease prices for seats.  Id., ¶ 109.

Demutualization

Penn Mont's chief complaint here is that defendants lobbied for demutualization to bilk seat holders and to enrich themselves in violation of state common law and federal racketeering law.  Frucher allegedly intimidated seat holders and engaged in self-dealing.  For example, Frucher and the Board threatened to reinstitute an onerous capital funding fee if seat holders failed to approve the demutualization plan.  Id., ¶ 113.  Frucher used excessive compensation to buy the Board's support.  Id., ¶ 137.  Under Frucher's direction, PHLX retained advisors on demutualization who stood to gain from demutualization via unspecified "insider arrangements," and Frucher failed to disclose those arrangements.  Id., ¶¶ 110-112, RICO Case Statement, p. 13.

Frucher and the Board also allegedly misled seat holders about the risks and benefits of demutualization.  On February 12, 2003, Frucher communicated via mail, wire and/or hand

9

delivery that there "is no intent to 'carve out' an equity stake for Management as part of the

process of demutualization." Compl., ¶ 132.   Members of the Exchange then received a 200-

page Information Memorandum dated October 22, 2003.  Def.'s Ex. B.[5]  The Memorandum

explained the reasons for demutualization, the definition of demutualization, the risks and

benefits, and a description of the capital stock post-demutualization.  Id. at 9-10, 11, 27-36, 97-

103.   Demutualization would enable the Exchange to raise money through the sale of equity

instead of exclusively through debt.  Id. at 9 ("Under the mutual structure through which we

currently operate, borrowing is the only mechanism practically available to finance large capital

requirements.").  The Memorandum informed seat holders that the strategic transactions could

dilute seat holders' ownership of PHLX and that additional equity could be sold without a

shareholder vote.  Ex. B., at 27.

On November 4, 2003, Frucher wrote to seat holders in an open letter sent by mail, wire

and/or hand delivery acknowledging that management could actually receive up to 10% of the

outstanding common stock after demutualization.  Compl., ¶ 133.  Demutualization occurred on

January 20, 2004.  Id., ¶ 31.

On April 21, 2005, PHLX issued a news release announcing that it had rejected an offer

to purchase PHLX for $50,000,000.  In the memorandum, Frucher stated that,

> Negotiations over the offer lasted several months, during which time a Special
> Committee of the Board of Governors monitored discussions and provided
> substantial input to PHLX management.  The Special Committee and the Board
> unanimously rejected the offer as being inferior to other alternatives . . . and as not

---

[5]In ruling on a motion to dismiss, the Court may rely on documents "*integral to or
expressly relied* upon in the complaint," even if the plaintiff fails to attach those documents
thereto.  In re: Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting
Shaw v. Digital Equip. Co., 82 F.3d 1194, 1220 (3d Cir. 1997)).

in the best long-term interests of PHLX's shareholders.

Def.'s Ex. G (PHLX Memo No. 0779-05).  Penn Mont alleges that the Board kept the deal a

secret from seat holders for months and ultimately rejected the deal because Frucher had not yet

obtained shares for himself and would not benefit from such a deal.  Compl., ¶ 153.  Frucher

allegedly violated PHLX's by-laws by failing to recuse himself in a deal in which he had a

personal interest.  Compl., ¶ 154.  A wealthy member of the Exchange also offered to buy the

Exchange in a bid worth more than the bid ultimately accepted by Frucher, but Frucher told the

member that the equity deals had already gone through, and the member was "too late."  Compl.

¶ 151.

On June 16, 2005, PHLX announced in a news release that Merrill Lynch and Citadel

would acquire 10% equity in PHLX through strategic investments.  Id., ¶ 146; Def.'s Ex. H.

Echoing the Information Memorandum, the news release states that these strategic investments

"will dilute original shareholders, [but] will enhance the Exchange's multi-prong strategy."

Def.'s Ex. H, at 1.  On August 16, 2005, PHLX announced that it would sell an additional 20%

equity in PHLX to CitiGroup, CSFB, Morgan Stanley Dean Witter and UBS.  Compl., ¶ 147;

Def.'s Ex. I.  The news release specified that the strategic investors had acquired an equity stake

with the possibility of obtaining a greater stake upon attainment of "performance criteria."  Def.'s

Ex. I.  Penn Mont alleges that shareholders were not consulted regarding any of these equity

sales, despite Frucher's promises to the contrary.  Compl., ¶ 152.  Around that same time, the

Board offered seat holders $90,000 per 100 shares issued in exchange for their seats.  Id., ¶ 148.

In 2004, when all was said and done, 50,500 shares issued, with an additional 5,050

issuing in 2005.  Id., ¶ 5.  After receiving shares of PHLX, Frucher allegedly "boasted" at an

unspecified time and place that he was now the largest single PHLX shareholder.  Id., ¶ 141.

Steisel allegedly received unauthorized shares, as did Briggs.  Id., ¶¶ 15, 142.  Penn Mont

alleges that it has lost $400,000 in seat rent, id. ¶ 36, and that former seat holders have lost over

$4,000,000 as a result of demutualization.  Id., ¶ 130.  Penn Mont  asserts that demutualization

itself caused no harm, but the manner by which defendants implemented it harmed all former

seat holders.  RICO Case Statement, p. 13 ("[D]emutualization itself was not the cause of

plaintiffs [*sic*] harm, rather it was the mismanagement and fraud of the defendants.").

Culture of Secrecy and Retaliation

The Board allegedly maintains a culture of secrecy, which impedes corporate governance.

Meeting minutes, if kept at all, are routinely destroyed or altered.  Id., ¶ 165.  Those outside of

Frucher's "inner circle" have been shut out.  Id., ¶`167.  For example, one of Penn Mont's

partners recently submitted an independent nomination for the Board, but someone – not named

in the complaint – erased signatures from his petition just minutes prior to the Nominating

Committee's certification process, and then informed the partner that he had insufficient

signatures.  Id., ¶ 168.  The partner requested a hearing, but PHLX refused to provide any details

about the incident.  Id., ¶ 170.

Penn Mont alleges that it has suffered from baseless and harassing regulatory

investigations by PHLX in retaliation for its complaints about the nominations process.  Id., ¶

172.  On April 19, 2005, Frucher announced that PHLX would close its equity trading floor in

June, 2006, allegedly in retaliation against Penn Mont for "questioning" the defendants'

misconduct.  Id., ¶¶ 173-174.

Finally, Penn Mont alleges that PHLX failed to submit claims on its insurance policy to

12

pay for the legal defense of its officers and Board members, costing Penn Mont and other seat

holders significantly.  Id., ¶¶ 83-87.  PHLX has refused to submit an insurance claim allegedly to

avoid the investigation that would ensue.  Id., ¶ 87.

<strong>Jurisdiction and Legal Standard</strong>

Jurisdiction is under 28 U.S.C. §§ 1331 and 1367(a).  In deciding a motion to dismiss

pursuant to Fed. R. Civ. Proc. 12(b)(6), the Court must accept plaintiffs' well-pleaded factual

allegations as true, but is not compelled to accept "unsupported conclusions and unwarranted

inferences."  Schuylkill Energy Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 417 (3d Cir.

1997).  Where, as here, a plaintiff submits a RICO case statement, the Court may also consider

facts alleged in the case statement.  Glessner v. Kenny, 952 F.2d 702, 712 n.9 (3d Cir. 1991).

A plaintiff need only provide a "short and plain" statement of his case pursuant to Fed. R.

Civ. Proc. 8(a), but the Supreme Court recently clarified the requirements of notice pleading in

cases alleging an unlawful conspiracy.  Bell Atl. Corp. v. Twombly, – U.S. – , 127 S. Ct. 1955,

1966 (2007).  Twombly requires plaintiffs to plead facts that "raise a right to relief beyond the

speculative level."  Id., at 1965.  A plaintiff alleging a conspiracy must allege facts that make

such an alleged conspiracy plausible, not merely conceivable:

> Asking for plausible grounds to infer an agreement does not impose a probability
> requirement at the pleading stage; it simply calls for enough fact to raise a
> reasonable expectation that discovery will reveal evidence of illegal agreement.

Id.

A plaintiff alleging fraud must meet the heightened pleading requirements of Fed. R. Civ.

Proc. 9(b), and a RICO plaintiff who alleges the predicate acts of mail and wire fraud must

supply specific information such as the date, place or time of the fraud, the identity of the person

13

who made the alleged misrepresentation, and the general content of the misrepresentation.  Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004).

**Analysis**

PennMont fails to state any viable claim in its 255-paragraph complaint.  Its state law claims are largely precluded by the prior state court action, and PennMont lacks standing to assert any of its claims.

A.      Issue Preclusion and PennMont's State Law Claims

Issue preclusion largely bars PennMont's state law claims, which were asserted and rejected in the prior Pennsylvania state court action.  Def.'s Exs. D (State Action Compl.), E (First Am. Compl.), N (Sec. Am. Compl.) & M (Super. Ct. op.).  "A federal court looks to the law of the adjudicating state to determine its preclusive effect."  Del. River Port Auth. v. Fraternal Order of the Police, 290 F.3d 567, 573 (3d Cir. 2002) (citation omitted).   Thus, Pennsylvania law applies.

The doctrine of issue preclusion bars relitigation of issues already decided in a prior action.  Under Pennsylvania law, issue preclusion applies when:

> (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; and (4) the party or person privy to the party against whom the plea is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. ___

Greenway Ctr., Inc. v. Essex Ins. Co., 475 F.3d 139, 146 (3d Cir. 2007) (quoting Shaffer v. Smith, 543 Pa. 526, 529, 673 A.2d 872, 874 (Pa.1996)).  In Greenway Ctr., the Third Circuit noted that a possible fifth element of issue preclusion -- that the determination in the prior proceeding must have been "essential to the judgment" – "is not found in Pennsylvania law as

established by the Pennsylvania Supreme Court."   475 F.3d at 146 n. 6.[6]

     1.      Identity of the Issues

     The first element of the issue preclusion defense is identity of the issues.   Whether issues

are identical depends, of course, on what issues were decided in the prior action.

     In 1998, PennMont and a member filed their suit against PHLX in the Court of Common

Pleas, Philadelphia County, seeking a preliminary injunction, which was denied.   In 2003,

PennMont amended its complaint and again sought equitable relief, which was denied.

PennMont never appealed the court's denial of a preliminary injunction.   PHLX moved for

summary judgment, and the Court of Common Pleas granted summary judgment.   PennMont

then filed a motion for reconsideration and sought leave to amend its complaint.   The Court of

Common Pleas denied the motion for reconsideration and leave to amend.   PennMont appealed.

The Superior Court affirmed both rulings – the grant of summary judgment, and the denial of

leave to amend.   First, the Superior Court decided that appellants had waived their challenge to

demutualization by failing to appeal the lower court's denial of the preliminary injunction, and by

failing to seek timely review of the demutualization plan by the SEC.   As a result, appellants had

no basis to challenge demutualization and the resulting diminution in their ownership interest in

the Exchange.   The federal complaint presents the identical issue, namely whether

---

     [6]A 2005 Pennsylvania Supreme Court case appears to require a party invoking issue
preclusion to establish this fifth element under Pennsylvania law.   Office of Disciplinary Counsel
v. Kiesewetter, 889 A.2d 47, 50 (Pa. 2005) (listing five criteria).   This Court ordered the parties
to brief issue preclusion under the standard set in Kiesewetter, prior to the Third Circuit's
decision in Greenway Ctr.   See Order of October 4, 2006 (Doc. # 33).   Because the Third
Circuit's interpretation of Pennsylvania state law is binding on this Court, I will analyze issue
preclusion under the four-factor test identified in Greenway Ctr., but I will also discuss the fifth
element.   475 F.3d at 146.

demutualization violated any applicable law.  See, e.g., Compl., ¶¶ 32-33, ¶¶ 36-37 (alleging that demutualization extinguished seats and caused plaintiff to lose seat rent and seat value).

Second, the Superior Court decided that PennMont's allegations failed to state a claim for breach of contract, breach of fiduciary duty, conversion, fraud, fraudulent concealment, negligence or unjust enrichment, which PennMont asserted in its proposed second amended complaint.  The Superior Court ruled that under Pennsylvania law, "'a court is not required to allow amendment of a pleading if a party will be unable to state a claim on which relief could be granted.'"  The Superior Court concluded that appellants had proven their "inability, even with amendments, to state an actionable claim."  Although PennMont characterizes these statements as "dicta," the Superior Court's opinion reveals that the Court assessed the sufficiency of appellants' complaints – "past, present and proposed" – and found them inadequate because they all related directly or indirectly to appellants' opposition to demutualization.  Id.  In other words, the Superior Court decided that PennMont had not alleged facts to entitle it to relief under any of the claims asserted.  PennMont now proposes the same factual allegations and same theories of relief in its federal complaint in the instant action.

The proposed second amended complaint and current federal complaint assert identical state law claims[7], and the following identical allegations:

---

[7]The federal complaint contains two separate fiduciary duty claims – one direct and one derivative – while PennMont's proposed second amended complaint in the state court action combines requests for direct and derivative relief in a single claim for breach of fiduciary duty. The federal complaint also contains a claim for "disgorgement," but disgorgement is a type of remedy and not a separate cause of action.  See Restatement (Third) of Restitution & Unjust Enrichment, § 51, Comment a. (Tent. Draft. 2007) ("Section 51 is not in itself a substantive source of liability.  Rather it addresses the amount of recover once liability has been established . . . .").  Therefore, as a practical matter, the two complaints assert identical state law claims.

- As a result of demutualization, plaintiff has lost seat rent in excess of $400,000.  SAC, ¶ 41; Compl., ¶ 36.
- As a result of demutualization, plaintiff has lost seat value of at least $1,000,000.  SAC, ¶ 42; Compl. ¶ 37.
- Mismanagement by PHLX has led to investigations and orders by the SEC and DOJ. SAC, ¶ 46; Compl. ¶ 40.
- Several board members assumed their offices with conflicts of interest they failed to disclose, and they failed to recuse themselves on matters presenting a conflict.  SAC, ¶ 55; Compl. ¶ 54.
- One example of such a conflict is the QQQ scheme.  SAC, ¶ 55; Compl. ¶ 55.
- PHLX's subsidiaries helped lower costs for seat holders.  SAC, ¶ 64; Compl. ¶ 67.
- The SEC found violations in connection with PHLX's operation of its subsidiaries.  SAC, ¶¶ 67-68, Compl., ¶¶ 70-71.
- Timothy J. Guiheen resigned because of his role in the misconduct relating to the subsidiaries, but he received a generous severance package anyway.  SAC, ¶¶ 71-72; Compl., ¶¶ 74-75.
- PHLX failed to submit a claim to its insurance carrier to cover its legal fees, thereby wasting PHLX's assets.  SAC, ¶ 83; Compl. ¶ 84.
- PHLX diverted operating funds to pay excessive compensation to management.  SAC, ¶ 100; Compl. ¶ 92.
- In the course of implementing demutualization, the Board approved extended terms of service for themselves, permitting them to collect stipends for longer.  SAC, ¶ 102; Compl. ¶ 94.
- PHLX instituted a capital funding fee; PennMont paid more than $324,000 in such fees. SAC, ¶¶ 103-104; Compl., ¶¶ 96-98.
- No tax opinion was shared as to the tax treatment of the fee.  SAC, ¶ 106; Compl., ¶ 100.
- The capital funding fee was misused to pay for bonuses.  SAC, ¶¶ 107, 110; Compl., ¶ 96.
- Frucher took various actions that depressed seat prices, such as instituting an equity trading permit system and capping lease prices.  SAC, ¶ 122; Compl., ¶ 109.
- At Frucher's behest, the Board hired a consulting firm to advise the Board on demutualization, but that firm stood to benefit directly from demutualization.  Paying an advisor to recommend a "predetermined" outcome was wasteful.  SAC, ¶¶ 123-125; Compl., ¶¶ 110-112.
- The SEC and DOJ have cited approximately 238 compliance deficiencies.  SAC, ¶ 130; Compl. ¶ 114.
- Despite compliance deficiencies, the Board continues to approve increasing compensation for senior management. SAC, ¶¶ 135, 138-139; Compl. ¶¶ 119, 122-123.
- PHLX has hired surveillance officers as a "quick fix" for its compliance woes.  SAC, ¶ 132; Compl., ¶ 116.
- Through the QQQ scheme, PHLX lost $2,000,000 in tape revenue.  SAC, ¶¶ 142-143; Compl., ¶¶ 127-128.
- PHLX "sought to terminate a real estate lease and bought it out for in excess of $1,000,000 because of the actions required by the SEC relating to the dissolution of

Philadep and restrictions imposed on the operations of SCCP."  SAC, ¶ 144; Compl., ¶ 129.

•	Frucher hired his friend, Steisel, to serve as a consultant.  SAC, ¶ 146; Compl., ¶ 155.
•	In 2003, Steisel received a bonus in excess of $80,000 and total compensation exceeding $272,000.  SAC, ¶ 148; Compl., ¶ 157.
•	PHLX has wasted assets paying for Steisel's travel, meals and lodging expenses.  SAC, ¶ 149; Compl., ¶ 160.
•	PennMont has incurred $340,000 in legal fees.  SAC, ¶ 165; Compl., ¶ 218.

PennMont argues that the Superior Court improperly made "findings of fact" in ruling that PennMont had waived its right to challenge demutualization, but PennMont's petition for allocatur to the Pennsylvania Supreme Court was denied, thereby making the Superior Court ruling final.  PennMont also contends that the Superior Court erred in finding that all of its allegations, past, present and proposed, related to demutualization, but this Court has no power to review the wisdom or accuracy of the Superior Court's judgment.  See Del. River Port Auth., 290 F.3d at 574.

2.	Final Adjudication on the Merits

The second element of issue preclusion is that the prior action must have resulted in a final adjudication on the merits.  The prior state action resulted in summary judgment for the defendants, which was affirmed on appeal.  Def.'s Ex. L, p. 5, Ex. M, p. 7.  Summary judgment is a judgment on the merits for issue preclusion purposes.  Murphy v. Duquesne Univ. of Holy Ghost, 745 A.2d 1228, 1236 (Pa. Super. Ct. 1999); see also Schuldiner v. Kmart Corp., 450 F. Supp. 2d 605, 608-609 (E.D. Pa. 2006).

Dismissal for failure to state a claim also has preclusive effect.  18A Charles A. Wright, et al., Federal Practice and Procedure, § 4439 (2d ed. 2002).[8]  Issue preclusion may apply to a

_____

[8]Because of the similarity of issue preclusion under Pennsylvania law and federal common law, I will draw on federal authority in my analysis.  Cf. Del. River Port Auth., 290 F.3d

prior denial of leave to amend where denial was based on "the adequacy of the attempted

pleading . . . ."  Id.  In other words, when a court has found a prior complaint insufficient, a party

who re-pleads its dismissed claims in the same way may not litigate the question of sufficiency a

second time.  Id., n. 21 (citing Deutsch v. Flannery, 823 F.2d 1361, 1364-1365 (9th Cir. 1987));

see also, id. at n.2 (citing Guzowski v. Hartman, 969 F.2d 211, 216 (6th Cir. 1992) (issue

preclusion barred plaintiffs from relitigating same theories of recovery that had been joined in

first complaint and dismissed by the district court, but dismissal for failure to state a claim "only

determines the legal sufficiency of the complaint in respect to the facts alleged [in the prior

action.]")).  I predict the Pennsylvania Supreme Court would follow this reasoning.  Because the

Superior Court based its ruling largely on the insufficiency of PennMont's pleadings ("past,

present, and proposed"), its denial of leave to amend constitutes a final adjudication on the

merits.[9]

3.     Asserted Against the Same Party

The third element of issue preclusion is that the defense be asserted against the same

party that appeared in the prior action.  In its prior suit against PHLX and PHLX's directors in

state court, PennMont had an opportunity to establish the sufficiency of its complaint.  Contrary

to PennMont's contention, issue preclusion under Pennsylvania law does not require that the

same issue arise against the same defendants – only that issue preclusion be asserted against a

---

at 573 n. 10 (discussing elements of issue preclusion under federal common law).

[9]The Superior Court declined to "address [PennMont's] claims," but in the context of the
Superior Court's observations regarding waiver and the insufficiency of PennMont's pleadings,
this can mean only that the Superior Court declined to let PennMont proceed – not that the
Superior Court declined to assess the *sufficiency* of PennMont's claims.

party or its privy that appeared in the prior action in which the issue was decided.  Mellon Bank

v. Rafsky, 535 A.2d 1090, 1093 (Pa. Super. Ct. 1987) ("Collateral estoppel may be used as either

a sword or a shield by a stranger to the prior action . . . .").  That party is PennMont.  Defendants

are entitled to invoke "defensive non-mutual collateral estoppel" against PennMont.  See

Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 329 (1971) (extolling

efficiency gains of defensive non-mutual collateral estoppel).  In other words, the prior state

court action decided two issues adverse to PennMont, and because PennMont asserts the same

issues in this action (albeit against new defendants), the prior adverse decision precludes

PennMont from doing so.

      4.      Party Against Whom Doctrine is Asserted Had Full and Fair Opportunity to
                 Litigate

      The fourth element of issue preclusion is that the party who is precluded had a "full and

fair" opportunity to litigate the issue to be precluded.  This element of issue preclusion is most

concerned with jurisdictional or procedural limitations in the prior proceeding that might have

prevented the losing party from fully litigating the issue.  See Wright, § 4423.  These concerns

have no relevance here.  PennMont's waiver of its challenge to demutualization and failure to

state a claim in its proposed second amended complaint were decided in a proceeding in which

PennMont appeared and argued the issues before the state appellate court.  Accordingly,

PennMont was not denied a full and fair opportunity to litigate.

      All four elements of collateral estoppel are met as to PennMont's state law claims, and as

a result, PennMont is precluded from relitigating those claims.[10]

_____

[10]As noted above, there is some authority to suggest that issue preclusion does not apply under Pennsylvania law unless the issues decided were "indispensable, material, and necessary to the prior action." Standard Pennsylvania Practice (2d. ed. 2004), § 65:100; Kiesewetter, 889 A.2d at 50 (issue decided must be "essential to the judgment").

The Superior Court made two rulings in the prior action: (1) that the trial court properly granted summary judgment; and (2) that the trial court properly denied leave to amend because PennMont had failed to state a claim. In affirming summary judgment, the Superior Court expressly ruled that PennMont could not assert a claim based on alleged injuries resulting from demutualization because it had failed to appeal or seek review before the SEC. This issue was material and necessary to the Court's holding. Id.

The Superior Court also found PennMont's proposed second amended complaint insufficient to state a claim, but it affirmed denial of leave to amend on a second theory, namely, that leave to amend should not be granted where it would prejudice the opposing party, and that amendment on the eve of trial would prejudice defendants. Def.'s Ex. M, p. 5. The Superior Court therefore relied on two rationales -- prejudice to defendants and insufficiency of PennMont's proposed second amended complaint. A question arises: was the state court's ruling on the sufficiency of the proposed second amended complaint "essential" to the judgment? A court's articulation of more than one ground for a holding does not automatically defeat the application of issue preclusion. In Mellon Bank, the Superior Court of Pennsylvania found that the trial court's reliance on two rationales barred the appellant from relitigating *either* issue:

> As alternative grounds were given for the decision in the prior case, it is difficult to determine which was 'essential to the judgment' to satisfy the test for application of the doctrine of collateral estoppel. Judge Brown, who decided both cases, evidently believed that the second reason . . .was essential to the judgment, for the court was not satisfied to rely on [the first].

535 A.2d at 1094. The Mellon court concluded that the trial court had offered two rationales because neither one on its own sufficed. Id at 1094.

Even if both rationales were independently adequate, this Court may still apply issue preclusion. The Third Circuit has addressed the rationale for the "necessity" rule under federal law and found a strict application of the rule unwarranted where the issues were actually litigated in a prior action. Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc., 458 F.3d 244, 254 (3d Cir. 2006) (likelihood of confusion of second set of trademarks, while technically unnecessary to cancellation proceeding involving first set of marks, had been litigated before the TTAB and therefore was binding on the parties). "A determination that is independently sufficient to support a court's judgment is not 'incidental, collateral, or immaterial to that judgment' . . . ." Id. (quoting Hicks v. Quaker Oats Co., 662 F.2d 1158, 1168 (5th Cir. 1981)). Although the Third Circuit applied federal law in Jean Alexander Cosmetics, its discussion of the policy served by the necessity rule is instructive.

The Third Circuit observed that the necessity rule was "rooted in principles of fairness" and that the purpose of the rule was to ensure: (1) that the finder of fact took "sufficient care" in

PennMont asserts a few stray facts that post-date the state court action, and as such,

PennMont never litigated the issue of whether those facts stated any claim.  These facts relate

primarily to: (1) the 2005 strategic investments and equity grants to Frucher and others, which

diluted PennMont's shares; (2) the Board's rejection of two offers to purchase the Exchange; (3)

a "cover up" of defendants' misconduct; and (4) retaliation against PennMont for questioning

defendants' misconduct.  As discussed below, none of these allegations state a claim.

B.      PennMont Also Lacks Standing to Raise its State Law Claims

        Even if the prior litigation had failed to preclude PennMont's state claims, those claims

and the additional stray also fail for lack of standing.  PennMont attempts to assert both direct

and derivative claims against PHLX corporate officers, directors and/or employees.  A direct

claim is a claim brought by a shareholder for injuries suffered individually; a derivative claim is a

claim brought by a shareholder on behalf of the corporation to redress injuries suffered by the

---

deciding the issue; and (2) that the issue was sufficiently material that the losing party had an
incentive to "contest an erroneous decision by appeal." Jean Alexander Cosmetics, 458 F.3d at
250.  This Court may give preclusive effect to independently sufficient alternative grounds in this
case and still serve those purposes.  First, there is no reason to believe that the Superior Court
performed an inferior analysis of the sufficiency of PennMont's proposed second amended
complaint simply because it also found that an amendment at that juncture would prejudice the
defendants.  Prejudice, after all, is not a function solely of timing, but also of substance.  Cf.
Mann, Inc v. Upper Darby Sch. Dist., 513 A.2d 528, 531 (Pa. Commw. Ct. 1986) (where
amended answer contained meritorious immunity defense, plaintiff was not "prejudiced" because
prejudice did not refer to disadvantage suffered on account of opponent raising a meritorious
argument or defense).  If PennMont had submitted a largely meritorious proposed complaint, the
Superior Court would not likely have found that defendants would have been "prejudiced."  A
truly meritorious complaint may have led the court to reverse the trial court's denial of leave to
amend.  Moreover, if PennMont's proposed second amended complaint had pled any claims
adequately, there is no reason for the Superior Court to find specifically that PennMont had failed
to do so.  Second, PennMont appealed the trial court's decision, and the sufficiency of the
proposed amendments was material, not incidental to that appeal.  Accordingly, the Superior
Court's reliance on two rationales for denying leave to amend does not deny defendants the
preclusive effect of the prior ruling.

corporation.  Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, 829 A.2d 143, 150 (Del. Ch.

2003).  Whether a claim is direct or derivative turns on the answers to two questions: "(1) who

suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who

would receive the benefit of any recovery or any other remedy (the corporation or the

stockholders, individually)?"  Tooley v. Donaldson, Lufkin & Jenrette, 845 A.2d 1031, 1033

(Del. 2004).[11]  If the corporation suffers the injury and is entitled to recover, the injury is

derivative, and a shareholder may bring the claim on behalf of the corporation only under certain

limited circumstances.

PennMont does not specify what alleged conduct forms the basis of what claims, nor do

the defendants identify them; thus, I am forced to identify the harms PennMont might have

incurred and then analyze whether PennMont has alleged any direct harm that would be

actionable under any of its claims.  Although PennMont casts only one of its nine state law

claims as derivative, neither plaintiff's nor the defendants' characterization is binding on me.  A

Court must make an independent determination as to whether a plaintiff's claim is direct or

derivative.  Anglo Am. Sec. Fund, 829 A.2d at 150 (court may not rely on parties'

characterization of claims in lieu of independently determining whether claims are direct or

derivative).  I will first address whether PennMont has standing to assert a derivative action and

then examine whether it has adequately alleged any direct, compensable harms.

      1.       PennMont lacks standing to assert a derivative claim

---

[11]In adopting this test, the Delaware Supreme Court rejected prior "confusing"
formulations of the direct-derivative distinction that employed the concept of "special injury."
Id. at 1033.  Because PHLX is a Delaware corporation, Delaware law applies pursuant to the
"internal affairs" doctrine.  Boyers v. Travelers' Protective Ass'n of Am., 75 F.2d 440, 441 (3d
Cir. 1934).

PennMont contends that it may pursue a derivative action on behalf of PHLX and asserts a self-styled "derivative" claim for breach of fiduciary duty.  Compl., ¶ 207 (alleging that defendants' misconduct included misappropriating assets, improperly rejecting deals and engaging in "deceptive practices" and sexual harassment).

A shareholder may assert a claim for injury to the corporation only if it satisfies certain preconditions.  Fed. R. Civ. Proc. 23.1 requires a plaintiff asserting a derivative claim in federal court to, among other things:

> [A]llege with particularity the efforts, if any, made by the plaintiff, to obtain the action the plaintiff desires from the directors or comparable authority . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

Rule 23.1 establishes a heightened pleading standard, but it does not establish an independent demand requirement.  Kanter v. Barella, 489 F.3d 170, 176 (3d Cir. 2007).  State law establishes the demand requirement and the standards "to determine whether facts demonstrate [a] demand would have been futile and can be excused."  Id.[12]  Delaware law requires a shareholder to make a pre-suit demand, or in the alternative, a showing of demand futility.  Del. Ch. Ct. 23.1; Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984) ("By its very nature, a derivative action impinges on the managerial freedom of directors.  Hence, the demand requirement of Chancery [Ct. R.] 23.1 exists at the threshold . . . ."), overruled on other grounds by Brehn v. Eisner, 746 A.2d 244 (Del. 2000).

In its derivative claim, PennMont alleges that defendants misappropriated corporate assets, enriched themselves, rejected lucrative deals out of personal interest and created an

---

[12]Because PHLX is incorporated in Delaware, the demand futility law of Delaware applies.  Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-109 (1991) (law of state of incorporation dictates substantive law of demand futility).

ongoing hostile environment at the Exchange.  Compl., ¶ 207.  PennMont twice "demand[ed]" Frucher to resign and for PHLX to take action against defendants.  Id., ¶ 208.  However, PennMont fails to offer any particularized facts regarding these efforts and why they were unsuccessful.  Kanter, 489 F.3d at 179.  No time or place is specified, nor is it clear whether demand was ever made on other specific directors, and how they responded.  In its opposition, PennMont argues that the Board was aware of PennMont's ongoing litigation in state court, and that it could have "stepped in" at any time, but PennMont offers no details regarding who was on the Board during the state court litigation, and whether any of those Board members remained on the Board at the time this action was commenced.  Pl.'s Opp'n, 13.  PennMont cites no authority for its proposition that a Board's knowledge of a prior lawsuit excuses a shareholder from making a demand prior to initiating a subsequent lawsuit.  PennMont simply has not adequately pled its efforts to make a demand.

PennMont alternatively argues that demand was futile because Frucher so thoroughly dominated the Board and disabled the Board's normal functioning.  Pl.'s Opp'n, 13-15.  Under Delaware law, a plaintiff alleging demand futility must allege particular facts to create a reasonable doubt that: "(1) the directors are disinterested and independent; and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  Aronson, 473 A.2d at 814.  When a plaintiff does not challenge a particular decision of the Board, or complains of Board inaction, the second prong of Aronson does not apply, and a plaintiff must demonstrate demand futility by showing "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993).

Defendants argue that the <u>Rales</u> standard applies, and PennMont also recites the <u>Rales</u> standard, Pl.'s Opp'n, 12.[13]  To satisfy <u>Rales</u>, PennMont relies on three arguments, based on generalized allegations that: (1) defendants would have to sue themselves; (2) the Board faced a substantial threat of liability for the misconduct alleged and/or was "wilfully blind;" and (3) Frucher alternatively dominated the Board and plied it with generous stipends, which crippled the Board's ability to assess demand impartially.  I address each of these contentions and conclude that none excuses demand.

PennMont first seeks to bypass the demand requirement because "the individual defendants who control the Board of Governors committed the acts which are the subject of this action."  Compl., ¶ 208.  This allegation is inadequate to establish that the Board was unable to evaluate a demand with disinterest.  <u>In re: Discovery Lab. Deriv. Litig.</u>, – F.R.D. –, 2007 WL 1300358, *3 (E.D. Pa. May 1, 2007) ("It is not enough for plaintiffs to claim, without support, that the defendants participated in the challenged action or inaction and would, therefore, be unwilling to sue themselves.").  Without such a rule, demand would always be excused whenever directors were named as defendants in a derivative lawsuit, which would "eviscerate" the demand requirement.  <u>Jacobs v. Yang</u>, No. Civ. A. 206-N, 2004 WL 1728521, *6 n. 31 (Del. Ch. Aug. 2, 2004).  This one-line attempt to plead demand futility fails.

Under Delaware law, a shareholder may show demand futility by alleging that half the Board lacked independence because of "a sufficiently substantial threat of personal liability to

---

[13]Typically, a court performs demand futility analysis on a claim by claim basis. <u>Amalgamated Bank v. Yost</u>, No. 04-0972, 2005 WL 226117, * 8 (E.D. Pa. Jan. 31, 2005).  Here, however, PennMont has not specified which allegations relate to which claims; thus, I will analyze demand futility with regard to all of PennMont's allegations, the bulk of which do not implicate any affirmative Board decision.

compromise their ability to act impartially on a demand." Guttman v. Huang, 823 A.2d 492, 503 (Del. Ch. 2003). PennMont has failed to make this showing. In December 2005, when this lawsuit was filed, the PHLX Board had twenty-two members. Pl.'s Opp'n, Ex. 5 (excerpt from 2005 annual report). PennMont names one current Board member, Frucher, and two former Board members, Foley and Nagy, as defendants. PennMont then proceeds to implicate various directors. PennMont alleges that Board member John Wallace approved unwarranted severance packages in 1997 and hatched the QQQ scheme with Frucher in 2002 or 2003; that PennMont sued Isabelle Benton for insider trading; and that Frucher recommended that Board Member Constantine Papadakis serve on the Compensation Committee ("Committee"), and that Papadakis subsequently received an increased stipend for his service on the Committee. Compl. ¶ 137. At most, PennMont alleges that six of twenty-two Board members were somehow involved in some kind of misconduct. Id. Even assuming that PennMont's vague allegations established that these six directors faced a "substantial threat" of personal liability, which they do not,[14] PennMont has failed to plead that *half the current Board* faced such a threat, and therefore, was disabled from considering demand impartially.[15]

---

[14]For example, regarding Benton, it is well-established that the "[m]ere allegations of insider trading do not make a director 'interested.'" Amalgamated Bank, 2005 WL 226117, * 12 n. 25. This is because conclusory allegations about insider trading lack critical information that would permit the Court to analyze the director's threat of personal liability, such as the specific material non-public information supposedly traded on. Guttman, 823 A.2d at 502.

[15]PennMont attempts to cast another six Board members as complicit in wrongdoing because they competed against one of PennMont's partners in the May 2005 election, but the fact of competition does not establish that these Board members had any bias against plaintiff, lacked independence or faced any liability for competing. Pl.'s Opp'n, 14.

PennMont supplements its pleadings in its opposition to implicate additional Board members, but even those additional allegations do not suffice. Pl.'s Opp'n, 14 (identifying four strategic investor Board members, not named in the complaint, who "had a hand in the scheme,"

PennMont further attempts to cast doubt on the Board's independence by alleging that Frucher dominated the Board, such that the Board could not assess demand impartially.  A plaintiff challenging the Board's independence must provide detailed allegations that would demonstrate that "through personal or other relationships the directors are beholden to the controlling person."  <u>Aronson</u>, 473 A.2d at 815.  The "shorthand shibboleth of 'dominated and controlled' directors is not sufficient."  <u>Id.</u>  Although domination may be pled through particularized allegations detailing close personal relationships between the controlling person and directors within his reach, conclusory allegations of "mere friendship" among Board members do not excuse demand.  <u>Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart</u>, 845 A.2d 1040, 1051 (Del. 2004).   PennMont's only specific allegations relating to Frucher's domination – if they can be called "specific" – are that Frucher had allies on the Board, Frucher promised the Board enhanced compensation and longer terms of service, and Frucher stated he wanted to run PHLX "top down."  Pl.'s Opp'n, 13.  PennMont argues that, in light of Frucher's "domination," defendants could not consider its demand with "disinterested business judgment."  Pl.'s Opp'n, 13, <u>Rales</u>, 634 A.2d at 934.

This argument is specious because PennMont has not properly alleged that Frucher dominated the Board.  PennMont's bare allegation that Frucher had "allies" at PHLX is simply inadequate to establish that Frucher controlled the Board.  PennMont does not describe any close

---

but not alleging any specific misconduct).  Of course, facts alleged for the first time in an opposition brief may not be considered a part of the complaint.  <u>Com. of Pa. ex. rel. Zimmerman v. Pepsico, Inc.</u>, 836 F.2d 173, 181 (3d Cir. 1988) (construing Rule 12(b)(6) in context of Soft Drink Interbrand Competition Act).  But <i>even if</i> the Court considers these allegations and concludes that an additional four Board members faced a substantial threat of liability or otherwise lacked independence, PennMont still would not have pled that half the Board was unable to consider demand impartially.

personal relationships between Frucher and anyone other than Steisel, Frucher's "friend" who is not even alleged to have served on the Board. Under Beam, this is insufficient. 845 A.2d at 1050, 1051.

Similarly, Frucher's "top down" management style does not establish that Frucher disabled the Board's normal functioning. PennMont makes no specific allegations that Frucher threatened Board members, retaliated against non-compliant Board members, or inspired fear in the Board. PennMont offers only conclusory allegations that Frucher controlled the nominating committee and compensation committee. In other words, the complaint contains no particularized allegations that Frucher's boorish management style disabled the Board, whether "through force of will" or any other method. Orman v. Cullman, 794 A.2d 5, 25 n. 50 (Del. Ch. 2002).

PennMont's other arguments also fail. Frucher's efforts to increase the Board's compensation and extend Board members' tenure do not establish demand futility. Customary payments to Board members are not inherently suspect. In re: Discovery Lab., 2007 WL 1300358, *3 ("[C]ourts have not found that the payment of 'a usual and customary director's fee' compromises a director's independence."). PennMont alleges no particular facts to suggest that Frucher unilaterally determined the Board's compensation or that such compensation exceeded the typical compensation for serving on a corporate board. Id. PennMont's allusions to "insider arrangements" do not specifically implicate any Board member other than Frucher. Therefore, PennMont's conclusory allegations that Frucher bought the Board's cooperation for his personal agenda are inadequate to excuse demand.

In its opposition brief, PennMont contends for the first time that the Board lacked

independence because a *differently constituted* Board informed shareholders about PennMont's

state court action against Frucher and the Exchange, and the news releases on this topic

sometimes quoted Frucher.  Pl.'s Opp'n, 14.  Even if this Court were to consider this new

allegation, which improperly introduces new facts outside of the complaint, this allegation would

establish nothing.  That the Board informed shareholders about PennMont's unsuccessful

litigation in state court years ago does not demonstrate that the current Board could not exercise

its disinterested judgment or that it was biased against PennMont.  To the contrary, keeping

shareholders and the Board apprised of the status of ongoing litigation against PHLX or its

directors would allow the Board to make an informed decision regarding a demand by a

shareholder who had not convinced any court that it had a viable claim.  For the foregoing

reasons, PennMont has failed to plead demand futility.[16]

Granting PennMont another opportunity to plead demand futility would be pointless.  In

response to defendants' substantial briefing, PennMont came forward with no additional facts it

would plead to excuse demand in an amended complaint, and PennMont may not rely on facts

obtained through discovery to plead demand futility.  The Third Circuit recently observed that

"[a]s a general rule, a plaintiff in a shareholder derivative suit may not use discovery to amend

---

[16]Although not addressed by either party, a set of PennMont's allegations appears to trigger <u>Aronson</u>: the Board's decision to approve an equity trading permit system and its decision to reject two offers to buy PHLX.  PennMont makes no allegation that any Board members stood to gain from the equity trading permit system or that they were "interested," nor does it raise a reasonable doubt that the decision was an exercise of the Board's business judgment.  <u>Aronson</u>, 473 A.2d at 814.  Regarding the Board's rejection of two offers to buy the Exchange, PennMont fails to allege any facts to suggest that any specific Board members other than Frucher were "interested" in these transactions, and PennMont fails to create a reasonable doubt that these decisions were in the long-term best interests of the Exchange.  Thus, the facts contained in the complaint do not create a reasonable doubt that the Board exercised its business judgment when making these decisions, and PennMont has not satisfied the requirements of <u>Aronson</u>.  <u>Id.</u>

demand futility allegations," but recognized an exception for after-discovered evidence obtained by stipulation of the parties.  In re: Merck & Co, Inc. Sec., Deriv. & ERISA Litig., – F.3d– , 2007 WL 2049017, *6 (3d Cir. July 18, 2007).  No such stipulation exists in this case.

>    2.    PennMont suffered no actionable harm

Lacking standing to assert any derivative claims, PennMont attempts to assert a number of direct claims under state law, but none of the injuries it alleges support such claims.  The following sections review all the injuries for which PennMont could conceivably seek redress via a "direct" claim.[17]  None of the injuries are harms suffered by PennMont, or the harms are otherwise not actionable.

>>    i.    Wasteful expenditures, revenues foregone

PennMont alleges widespread waste of PHLX's assets.  The complaint alleges that unspecified Board members rewarded former directors Giordano and Guiheen with "golden parachutes," despite their misconduct relating to PHLX's subsidiaries.  PHLX paid excessive compensation to Frucher and his cronies and treated them to lavish travel, lodging and meal expenses.  PHLX hired the Hay Group, which merely told the Board what Frucher wanted them to hear, namely, that Frucher's compensation should be increased.  Defendants misused PHLX's funds by diverting the capital funding fee to bonuses and general operating expenses.  Defendants failed to seek reimbursement for legal fees from the PHLX insurance carrier out of fear of an ensuing investigation, which depleted PHLX's assets.  Under Frucher's tenure, PHLX has failed to comply with federal regulations, resulting in penalties and fines.  PHLX has also failed to collect revenue due to it, as illustrated by the QQQ scheme in which Frucher and Nagy funneled

_____

[17]These include the stray facts that were not alleged in the state court action.

money to a PHLX member, Heard & Co., to pay Nagy and/or Ameritrade for trades, and the so-called computer glitch that led PHLX to lose out on millions of dollars of tape revenue.

Corporate waste is a "classic" derivative harm.  Winston v. Mandor, 710 A.2d 835, 845 (Del. Ch. 1997).  Corporate waste is derivative because it diminishes the value of the corporation as a whole and entitles the corporation to recover damages.  See, e.g., Kramer v. W. Pac. Indus., 546 A.2d 348, 353 (Del. 1988) (cited with approval by Tooley, 845 A.2d at 1035 n.7).

Every one of these injuries is a form of corporate waste.  In the light most favorable to PennMont, the alleged "golden parachutes" depleted PHLX's resources, not PennMont's; excessive compensation to senior management and reimbursement for Frucher and Steisel's lavish travel, lodging and meal expenditures depleted PHLX's resources, not PennMont's; hiring the Hay Group wasted PHLX's assets, not PennMont's; and penalties for PHLX's regulatory infractions are paid by PHLX, not PennMont.  Misusing the capital fee also constitutes a derivative harm.[18]  In diverting fees to pay bonuses as alleged, defendants would have damaged PHLX by depriving PHLX improved technology.  Plaintiffs do not dispute that PHLX lawfully imposed the fee and was entitled to the resulting revenues.  In other words, PHLX (and not the shareholders individually) would recoup the fees in the event that defendants were found liable for waste.  Therefore, misuse of the fee is a harm to the corporation, a derivative injury.

        ii.        Depressed seat prices, lost seat rent, share dilution and the strategic transactions

PennMont also alleges that defendants caused harm by imposing an equity trading permit

---

[18]PennMont does not challenge the imposition of the fee itself, but only the ultimate misuse of that fee.  Pl.'s Opp'n, 20.

system, which depressed seat prices, by promoting demutualization, which cost PennMont $400,000 in lost seat revenue, by hiding and then rejecting two lucrative offers to buy the Exchange, and by selling equity stakes in the Exchange to outside investors, which has diluted PennMont's ownership interest in the Exchange.  These allegations do not describe any direct injury.  First, PennMont offers no basis for an assertion that it would be entitled to recover for depressed seat prices caused by the Board's decision to adopt an equity trading permit system or other structural change to the Exchange.  Second, PennMont's purported loss of seat revenue on account of demutualization has no significance without some reference to the value of PennMont's current ownership interest.  PennMont received shares in exchange for its seats; without information as to the value of that equity, the complaint does not even permit the inference that PennMont has been injured – directly or indirectly – by the elimination of seats.  Third, along the same lines, PennMont's assertion that it suffered harm because the Board failed to sell the Exchange for lucrative terms is meaningless without some reference to the value of PennMont's current interest in the Exchange.[19]  The bare allegations of lost seat rent or foregone sales do not account for the value of any shares PennMont received and do not establish any loss or injury.[20]

---

[19]Moreover, this purported harm is derivative.  In an analogous case, the Delaware Chancery Court held that shareholders alleging that the corporation had overpaid for a merger target had not stated a direct claim under Tooley because they were unable to explain why they, and not the corporation, would be entitled to any recovery.  In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808, 818 (Del. Ch. 2005).  PennMont challenges the Board's refusal to sell the Exchange for a "lucrative" price; however, PennMont has not offered authority for its proposition that it, and not the Exchange, would be entitled to any recovery if the Board were found to have sold the Exchange too cheaply.

[20]PennMont lost seat rent because demutualization extinguished the seat ownership system.  However, PennMont disclaims that demutualization *itself* harmed seat holders, instead

PennMont also allegedly suffered harm because its ownership of the Exchange has been diluted by the sale of equity to outside investors.  See, e.g., Compl., ¶ 234 (alleging share dilution due to defendants' fraud).  Prior to demutualization, PennMont owned five seats out of 505, and after demutualization, it presumably received 500 shares (100 shares for each seat) out of a base of shares greater than 50,500.[21]  As a result, PennMont's proportional share of the Exchange has been diluted.

Courts typically treat share dilution as a derivative harm because the reduction in share value reflects the decline in value of the corporate entity as a whole.  Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 732 (3d Cir. 1970); In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808, 818 (Del. Ch. 2005) (claim that Board overpaid for merger target, diluting shareholders' stock, was derivative).  Delaware law recognizes an exception to this rule when a controlling shareholder causes minority shareholders to lose share value and voting power.  Gentile v. Rossette, 906 A. 2d 91, 100 (Del. 2006).  Gentile involved a claim arising out of a "self-dealing transaction" in which a creditor and controlling shareholder acquired additional stock by forgiving the corporation's debts for a cheap conversion rate.  Id. at 94.  This produced a huge increase in the creditor's ownership of the company, and a corresponding decrease in the minority shareholders' ownership.  Id. at 95.  The minority shareholders sued, asserting a direct claim on the basis that the corporation was insolvent and "therefore suffered no harm by issuing its valueless stock to expunge" the debt.  Id. at 98.  The Supreme Court of Delaware ruled that

---

contending that it was harmed by the implementation of demutualization, presumably through the equity sales and alleged grants of equity to defendants.  See RICO Case Statement, p. 13.

[21]See Compl., ¶ 31 (as a result of demutualization, each seat owner received 100 shares of stock in exchange for the seat that was extinguished).

plaintiffs had asserted a direct claim because they had alleged that a controlling shareholder had caused the corporation to issue shares that increased the controlling shareholder's ownership of the money at the expense of the minority shareholder.  Id. at 100.  The resulting reverse-Robin Hood redistribution of value and power from the minority to the majority constitutes a harm separate and apart from "an equal dilution of the economic value and voting power of each of the corporation's outstanding shares."  Id. at 100.

This exception is not available to PennMont because the complaint does not adequately allege the existence of a controlling shareholder, nor does it allege that PHLX is insolvent. PennMont's vague allegations on information and belief that Frucher owns shares in the Exchange do not amount to an allegation that Frucher owns a controlling stake.[22]  Absent any controlling shareholder, there is no "extraction" and "redistribution" from the minority to the controlling majority, and share dilution remains a derivative harm.  Id. at 100.

> iii.     Retaliation, cover up and closure of the equity trading floor

PennMont also alleges that defendants caused harm by committing miscellaneous acts of retaliation and by concealing and/or destroying meeting minutes involving management. PennMont alleges that unnamed individuals prevented one of PennMont's partners from appearing on the ballot for a Board position.  PennMont further alleges that on April 19, 2005,

---

[22]A "controlling shareholder" may be a majority shareholder or a minority shareholder who dominates the corporation.  See Mary Siegel, The Erosion of the Law of Controlling Shareholders, 24 Del. J. Corp. L. 27, 34-35 (1999).  Defendants correctly note that Frucher cannot be a controlling shareholder under the "majority shareholder" definition because public documents relied upon by plaintiffs indicate that the strategic investors own a majority of the Exchange.  In addition, PennMont has not alleged facts from which it could be inferred that Frucher "dominated" the Board through personality or force of will.  Orman, 794 A.2d at 25 n. 50.  See Sec. B(1), supra.

Frucher closed the equity trading floor in retaliation for PennMont "questioning" the Board's conduct, and that Frucher moved PennMont to a less desirable part of the trading floor.  Compl., ¶ 173.

These allegations do not plead any actionable injury.  As defendants note, PennMont fails to allege that any defendants even knew about the ballot incident.  See Def.'s Mot., p. 45 n. 31. Further, "any suggestion that the plan to close the equity floor is a bad decision is simply a derivative claim for mismanagement of PHLX."  Id.  Closing the trading floor may affect business on the Exchange, but PennMont does not allege that it was singled out in any way. Instead, PennMont alleges that the whole equity trading floor was closed.  Frucher's alleged act of assigning PennMont to "undesirable floor space" may have been petty, but not unlawful. Finally, PennMont's allegation that meeting minutes are altered or destroyed by unspecified individuals suggests a possible harm to PHLX due to a lack of transparency, but not to PennMont directly.[23]

For these reasons, PennMont fails to state any actionable harm resulting from defendants' alleged misconduct, and its state law claims are dismissed.  PennMont's injuries are derivative, and it has failed to make a proper demand on the Board or adequately plead demand futility.  As a result, PennMont may not proceed on any direct or derivative claims.

---

[23]In connection solely with its breach of contract claim, PennMont alleges damages in the amount of $340,000 in legal fees.  Compl., ¶ 218.  PennMont does not allege that any contract existed between PennMont and defendants.  Instead, the contractual relationship at issue was between PennMont and PHLX.  Id., ¶ 213.  PennMont has no basis for seeking recovery of costs it chose to incur when defendants breached their duties to some third party.  Thus, even this arguably direct injury to PennMont does not allow PennMont to assert any claims because the injury was not caused by any breach of contractual duties owed to PennMont.

C.      PennMont Lacks Standing to Assert a Violation of RICO[24]

PennMont's failure to assert any direct injuries as explained in relation to its state law

claims is fatal to its RICO claims as well, because PennMont lacks standing to bring its RICO

claims.  RICO prohibits racketeering activity, defined as the commission of crimes such as mail

fraud, wire fraud, money laundering, obstruction of justice, witness intimidation, and other state

and federal crimes listed in 18 U.S.C. § 1961(1).  See 18 U.S.C. § 1961, et. seq.  18 U.S.C. §

1964(c) creates a civil action under RICO and entitles a victorious plaintiff to treble damages.

To have standing under civil RICO, a plaintiff must allege that it suffered an injury to its

business or property interest "by reason of a violation of section 1962 . . . ."  18 U.S.C. § 1964(c).

The "by reason of" provision means the complaint must allege that defendants' RICO violation

proximately caused injury to the plaintiff's business or property.  Holmes v. Securities Investor

Protection Corp., 503 U.S. 258, 274 (1992) (RICO liability attaches only for harm proximately

caused by RICO violation); Anderson v. Ayling, 396 F.3d 265, 267 (3d Cir. 2005) (plaintiff has

standing only if racketeering acts proximately caused harm).

PennMont alleges that defendants violated every provision of RICO.  18 U.S.C. §§

1962(a)-(d).  Each subsection of RICO targets distinct injuries relating to racketeering conduct.

Section 1962(a) targets injuries caused by the use or investment of racketeering proceeds into an

enterprise engaged in interstate commerce; section 1962(b) targets injuries caused by the

acquisition of an interest or control of an enterprise through a pattern of racketeering; section

1962(c) targets injuries caused by the racketeering acts themselves; and section 1962(d) targets

---

[24]The analysis by Gregory P. Joseph in his fine treatise has been helpful in this discussion.
Civil RICO: a definitive guide (2d ed. 2000).

injuries caused by conspiracies to commit RICO violations.  18 U.S.C. §§ 1962(a)-(d).

Indirect or derivative harms to a shareholder plaintiff do not confer RICO standing. Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 933-934 (3d Cir. 1999).  In Steamfitters, a labor union sued Philip Morris and other tobacco companies for RICO violations based an alleged conspiracy to conceal the harms of smoking.  Id. at 917. The union alleged that it suffered harm from increased health care expenditures on behalf of workers who suffered from smoking-related illnesses.  Id.  The Third Circuit found no proximate causation in part because of the difficulty in determining the portion of the union's increased expenditures attributable to the tobacco companies' alleged conspiracy.  Id. at 933.  In other words, the union's injury was too attenuated from defendants' alleged conspiracy.  Id.  Under this analysis, shareholders asserting an individual civil RICO claim may not sue for indirect injuries, or those suffered principally by the corporate entity.

Defendants' RICO violations allegedly injured PennMont in five distinct ways: (1) defendants misused the capital funding fees; (2) PHLX improperly failed to collect tape revenue or other fees, as illustrated by the QQQ scheme; (3) PHLX paid "unwarranted" bonuses and salaries; (4) shareholders lost seat rent and suffered share dilution through demutualization and the strategic transactions; and (5) PennMont has incurred legal fees on account of investigations by PHLX's internal regulatory officers who have targeted PennMont at the direction of Frucher. RICO Case Statement, pp. 15-16 (describing injuries).

This Court has already ruled that these injuries are derivative or otherwise non-actionable. See Sec. B(2), supra.  Under this same analysis, these injuries do not confer standing on PennMont for any of its RICO claims because there is no proximate cause.  See Holmes, 503

U.S. at 268 ("A central element of proximate cause is showing some direct relation between the injury asserted and the injurious conduct alleged."); Lakonia Mgmt. Ltd. v. Meriwether, 106 F. Supp. 2d 540, 550 (S.D.N.Y. 2000) (characterizing "direct/derivative dichotomy as an issue of proximate cause" in civil RICO context).  For example, PennMont's allegation of share dilution in the absence of a controlling shareholder describes a derivative injury, as dilution of PennMont's shares results from an injury to the corporation.  Under a proximate causation analysis, assuming dilution resulted from a RICO violation, defendants' RICO violation caused an injury to the corporation, which then injured PennMont.  The necessary middle step between the violation and any harm to PennMont, namely, the injury to the corporation, precludes a finding of proximate causation because the harm is too attenuated.  Therefore, a derivative injury to a shareholder also fails to satisfy the proximate cause requirement under RICO.

PennMont's allegation that it incurred legal fees to defend against internal regulatory proceedings brought by PHLX does not save its RICO claim because, although legal fees may constitute direct, actionable injuries under RICO, PennMont does not allege that these injuries were proximately caused by any predicate act.  See Walter v. Palisades Collection, LLC, 480 F. Supp. 2d 797, 804 (E.D. Pa. 2007) (legal fees constitute "out of pocket" loss and may confer standing under RICO).  PennMont tries to link its out-of-pocket expenses to the predicate act of witness intimidation,[25] but no where in the complaint are the defendants alleged to have interfered with any "official proceeding," an essential element of witness intimidation.  See 18

---

[25]See RICO Case Statement, pp. 17, 19, 21 (alleging "retaliation and intimidation" in violation of 18 U.S.C. § 1512 and that defendants "retaliated by investigating repeatedly, causing regulatory proceedings and sanctions and assigning undesirable floor space for plaintiff's operations.").

U.S.C. §§ 1512, 1515 (defining "official proceeding" as a proceeding before a federal court,

Congress, a federal agency or insurance regulatory agency or official).[26]

 The above equation of the direct/derivative dichotomy and the question of proximate

cause eliminates the need to evaluate PennMont's standing under each provision of RICO.  I will

dismiss the RICO claims on the basis of standing.  I also find that amendment would be futile.

Kanter, 489 F.3d at 181.  For the foregoing reasons, PennMont's entire complaint is dismissed

with prejudice.

---

 [26]In its opposition, PennMont tries to link its legal fees to alleged acts of mail fraud, but
that argument demonstrates the utter lack of proximate causation between those alleged predicate
acts and any actionable harm to PennMont: defendants allegedly used the mails and wires to
effectuate a scheme, which led plaintiff to protest, which resulted in regulatory proceedings by
PHLX, which then caused plaintiff to retain counsel and incur legal fees.  Pl.'s Opp'n, p. 37.

**<u>ORDER</u>**

**AND NOW**, on this __15th__ day of August, 2007, defendants' motion to dismiss (Doc.

#9) is **GRANTED**.

s/Anita B. Brody

_____

ANITA B. BRODY, J.
